# VEAZIE BANK *v.* FENNO.

1. The 9th section of the act of July 13th, 1866, amendatory of prior internal revenue acts, and which provides that every National banking association, State bank, or State banking association, shall pay a tax of ten per centum on the amounts of the notes of any State bank, or State banking association, paid out by them after the 1st day of August, 1866, does not lay a direct tax within the meaning of that clause of the Constitution which ordains that "direct taxes shall be apportioned among the several States, according to their respective numbers."

2. Congress having undertaken, in the exercise of undisputed constitutional power, to provide a currency for the whole country, may constitutionally secure the benefit of it to the people by appropriate legislation, and to that end may restrain, by suitable enactments, the circulation of any notes, not issued under its own authority.

3. The tax of ten per centum imposed by the act of July 13th, 1866, on the notes of State banks paid out after the 1st of August, 1866, is warranted by the Constitution.

ON certificate of division for the Circuit Court for Maine.

The Constitution ordains that:

"The Congress shall have power—

"To lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States.

"To regulate commerce with foreign nations, and among the several States, and with the Indian tribes.

"To coin money, regulate the value thereof, and of foreign coin."

It also ordains that:

"Direct taxes shall be apportioned among the several States . . . according to their respective numbers."

"No capitation or other direct tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be made."

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

With these provisions in force as fundamental law, Congress passed, July 13th, 1866,* an act, the second clause of the 9th section of which enacts:

"That every National banking association, State bank, or State banking association, shall pay a tax of ten per centum on the amount of notes of any person, State bank, or State banking association, used for circulation and paid out by them after the 1st day of August, 1866, and such tax shall be assessed and paid in such manner as shall be prescribed by the Commissioner of Internal Revenue."

Under this act a tax of ten per cent. was assessed upon the Veazie Bank, for its bank notes issued for circulation, after the day named in the act.

* 14 Stat. at Large, 146.

The Veazie Bank was a corporation chartered by the State of Maine, with authority to issue bank notes for circulation, and the notes on which the tax imposed by the act was collected, were issued under this authority. There was nothing in the case showing that the bank sustained any relation to the State as a financial agent, or that its authority to issue notes was conferred or exercised with any special reference to other than private interests.

The bank declined to pay the tax, alleging it to be unconstitutional, and the collector of internal revenue, one Fenno, was proceeding to make a distraint in order to collect it, with penalty and costs, when, in order to prevent this, the bank paid it under protest. An unsuccessful claim having been made on the commissioner of internal revenue for reimbursement, suit was brought by the bank against the collector, in the court below.

The case was presented to that court upon an agreed statement of facts, and, upon a prayer for instructions to the jury, the judges found themselves opposed in opinion on three questions, the first of which—the two others differing from it in form only, and not needing to be recited—was this:

"Whether the second clause of the 9th section of the act of Congress of the 13th of July, 1866, under which the tax in his case was levied and collected, is a valid and constitutional law."

The case coming here, *Messrs. Reverdy Johnson and C. Cushing, for the Veazie Bank,* contended:

1. That the tax in question was a direct tax, and that it had not been apportioned among the States agreeably to the Constitution.

In explanation of the nature of direct taxes they relied largely upon the writings of Adam Smith, and upon other treatises, English and American, of political economy.

2. That the act imposing the tax impaired a franchise granted by the State, and that Congress had no power to pass any law which could do that.

*Mr. Hoar, Attorney-General of the United States,* argued the case fully, *contra;* he relying upon the case of *Hylton* v. *The*

*United States,** as conclusive of the question independently of principle; and referring to the brief recently published† of General Hamilton, by whom the case was argued, to explain and support his view of what was there decided; a case confirmed recently, the Attorney-General observed, in *Pacific Insurance Company* v. *Soule.*‡

*In reply*, it was contended that *Hylton* v. *The United States* adjudged one point alone, which was that a tax on carriages was not a direct tax, and that from the dicta of the judges, in the case, it was obvious that the great question of what were direct taxes was but crudely considered.

The arguments at the bar, by which these views of the respective counsel were maintained, are not presented, the views of both sides of the case being fully presented from the bench, in the opinion of the court, and in the dissent from it.

The CHIEF JUSTICE delivered the opinion of the court.

The necessity of adequate provision for the financial exigencies created by the late rebellion, suggested to the administrative and legislative departments of the government important changes in the systems of currency and taxation which had hitherto prevailed. These changes, more or less distinctly shown in administrative recommendations, took form and substance in legislative acts. We have now to consider, within a limited range, those which relate to circulating notes and the taxation of circulation.

At the beginning of the rebellion the circulating medium consisted almost entirely of bank notes issued by numerous independent corporations variously organized under State legislation, of various degrees of credit, and very unequal resources, administered often with great, and not unfrequently, with little skill, prudence, and integrity. The acts of Congress, then in force, prohibiting the receipt or dis-

---

* 3 Dallas, 171.

† In The History of the Republic, by John C. Hamilton.

‡ 7 Wallace, 433.

bursement, in the transactions of the National government, of anything except gold and silver, and the laws of the States requiring the redemption of bank notes in coin on demand, prevented the disappearance of gold and silver from circulation. There was, then, no National currency except coin; there was no general* regulation of any other by National legislation; and no National taxation was imposed in any form on the State bank circulation.

The first act authorizing the emission of notes by the Treasury Department for circulation was that of July 17th, 1861.† The notes issued under this act were treasury notes, payable on demand in coin. The amount authorized by it was $50,000,000, and was increased by the act of February 12th, 1862,‡ to $60,000,000.

On the 31st of December, 1861, the State banks suspended specie payment. Until this time the expenses of the war had been paid in coin, or in the demand notes just referred to; and, for some time afterwards, they continued to be paid in these notes, which, if not redeemed in coin, were received as coin in the payment of duties.

Subsequently, on the 25th of February, 1862,§ a new policy became necessary in consequence of the suspension and of the condition of the country, and was adopted. The notes hitherto issued, as has just been stated, were called treasury notes, and were payable on demand in coin. The act now passed authorized the issue of bills for circulation under the name of United States notes, made payable to bearer, but not expressed to be payable on demand, to the amount of $150,000,000; and this amount was increased by subsequent acts to $450,000,000, of which $50,000,000 were to be held in reserve, and only to be issued for a special purpose, and under special directions as to their withdrawal from circulation.‖ These notes, until after the close of the war, were always convertible into, or receivable at par for

---

* See the act of December 27th, 1854, to suppress small notes in the District of Columbia, 10 Stat. at Large, 599.

† 12 Stat. at Large, 259.          ‡ Ib. 338.          § Ib. 345.

‖ Act of July 11th, 1862, Ib. 532; act of March 3d, 1863, Ib. 710.

bonds payable in coin, and bearing coin interest, at a rate not less than five per cent., and the acts by which they were authorized, declared them to be lawful money and a legal tender.

This currency, issued directly by the government for the disbursement of the war and other expenditures, could not, obviously, be a proper object of taxation.

But on the 25th of February, 1863, the act authorizing National banking associations* was passed, in which, for the first time during many years, Congress recognized the expediency and duty of imposing a tax upon currency. By this act a tax of two per cent. annually was imposed on the circulation of the associations authorized by it. Soon after, by the act of March 3d, 1863,† a similar but lighter tax of one per cent. annually was imposed on the circulation of State banks in certain proportions to their capital, and of two per cent. on the excess; and the tax on the National associations was reduced to the same rates.

Both acts also imposed taxes on capital and deposits, which need not be noticed here.

At a later date, by the act of June 3d, 1864,‡ which was substituted for the act of February 25th, 1863, authorizing National banking associations, the rate of tax on circulation was continued and applied to the whole amount of it, and the shares of their stockholders were also subjected to taxation by the States; and a few days afterwards, by the act of June 30, 1864,§ to provide ways and means for the support of the government, the tax on the circulation of the State banks was also continued at the same annual rate of one per cent., as before, but payment was required in monthly instalments of one-twelfth of one per cent., with monthly reports from each State bank of the amount in circulation.

It can hardly be doubted that the object of this provision was to inform the proper authorities of the exact amount of paper money in circulation, with a view to its regulation by law.

---

* Act of March 3d, 1863, 12 Stat. at Large, 670.
† Id. 712.　　　　　　　‡ 13 Ib. 111.　　　　　§ Id. 277.

The first step taken by Congress in that direction was by the act of July 17,.1862,* prohibiting the issue and circulation of notes under one dollar by any person or corporation. The act just referred to was the next, and it was followed some months later by the act of March 3d, 1865, amendatory of the prior internal revenue acts, the sixth section of which provides, " that every National banking association, State bank, or State banking association, shall pay a tax of ten per centum on the amount of the notes of any State bank, or State banking association, paid out by them after the 1st day of July, 1866."†

The same provision was re-enacted, with a more extended application, on the 13th of July, 1866, in these words: " Every National banking association, State bank, or State banking association, shall pay a tax of ten per centum on the amount of notes of any person, State bank, or State banking association used for circulation, and paid out by them after the first day of August, 1866, and such tax shall be assessed and paid in such manner as shall be prescribed by the Commissioner of Internal Revenue."‡

The constitutionality of this last provision is now drawn in question, and this brief statement of the recent legislation of Congress has been made for the purpose of placing in a clear light its scope and bearing, especially as developed in the provisions just cited. It will be seen that when the policy of taxing bank circulation was first adopted in 1863, Congress was inclined to discriminate for, rather than against, the circulation of the State banks; but that when the country had been sufficiently furnished with a National currency by the issues of United States notes and of National bank notes, the discrimination was turned, and very decidedly turned, in the opposite direction.

The general question now before us is, whether or not the tax of ten per cent., imposed on State banks or National banks paying out the notes of individuals or State banks

---

* Act of March 3d, 1863, 12 Stat. at Large, 592.

†  13 Ib. 484.                    ‡  14 Id. 146.

used for circulation, is repugnant to the Constitution of the United States.

In support of the position that the act of Congress, so far as it provides for the levy and collection of this tax, is repugnant to the Constitution, two propositions have been argued with much force and earnestness.

The first is that the tax in question is a direct tax, and has not been apportioned among the States agreeably to the Constitution.

The second is that the act imposing the tax impairs a franchise granted by the State, and that Congress has no power to pass any law with that intent or effect.

The first of these propositions will be first examined.

The difficulty of defining with accuracy the terms used in the clause of the Constitution which confers the power of taxation upon Congress, was felt in the Convention which framed that instrument, and has always been experienced by courts when called upon to determine their meaning.

The general intent of the Constitution, however, seems plain. The General Government, administered by the Congress of the Confederation, had been reduced to the verge of impotency by the necessity of relying for revenue upon requisitions on the States, and it was a leading object in the adoption of the Constitution to relieve the government, to be organized under it, from this necessity, and confer upon it ample power to provide revenue by the taxation of persons and property. And nothing is clearer, from the discussions in the Convention and the discussions which preceded final ratification by the necessary number of States, than the purpose to give this power to Congress, as to the taxation of everything except exports, in its fullest extent.

This purpose is apparent, also, from the terms in which the taxing power is granted. The power is " to lay and collect taxes, duties, imposts, and excises, to pay the debt and provide for the common defence and general welfare of the United States." More comprehensive words could not have been used. Exports only are by another provision excluded from its application.

There are, indeed, certain virtual limitations, arising from the principles of the Constitution itself. It would undoubtedly be an abuse of the power if so exercised as to impair the separate existence and independent self-government* of the States, or if exercised for ends inconsistent with the limited grants of power in the Constitution.

And there are directions as to the mode of exercising the power. If Congress sees fit to impose a capitation, or other direct tax, it must be laid in proportion to the census; if Congress determines to impose duties, imposts, and excises, they must be uniform throughout the United States. These are not strictly limitations of power. They are rules prescribing the mode in which it shall be exercised. It still extends to every object of taxation, except exports, and may be applied to every object of taxation, to which it extends, in such measure as Congress may determine.

The comprehensiveness of the power, thus given to Congress, may serve to explain, at least, the absence of any attempt by members of the Convention to define, even in debate, the terms of the grant. The words used certainly describe the whole power, and it was the intention of the Convention that the whole power should be conferred. The definition of particular words, therefore, became unimportant.

It may be said, indeed, that this observation, however just in its application to the general grant of power, cannot be applied to the rules by which different descriptions of taxes are directed to be laid and collected.

Direct taxes must be laid and collected by the rule of apportionment; duties, imposts, and excises must be laid and collected under the rule of uniformity.

Much diversity of opinion has always prevailed upon the question, what are direct taxes? Attempts to answer it by reference to the definitions of political economists have been frequently made, but without satisfactory results. The enumeration of the different kinds of taxes which Congress was

---

* Lane County *v.* Oregon, 7 Wallace, 73.

authorized to impose was probably made with very little reference to their speculations. The great work of Adam Smith, the first comprehensive treatise on political economy in the English language, had then been recently published; but in this work, though there are passages which refer to the characteristic difference between direct and indirect taxation, there is nothing which affords any valuable light on the use of the words " direct taxes" in the Constitution.

We are obliged, therefore, to resort to historical evidence, and to seek the meaning of the words in the use and in the opinion of those whose relations to the government, and means of knowledge, warranted them in speaking with authority.

And, considered in this light, the meaning and application of the rule, as to direct taxes, appears to us quite clear.

It is, as we think, distinctly shown in every act of Congress on the subject.

In each of these acts, a gross sum was laid upon the United States, and the total amount was apportioned to the several States, according to their respective numbers of inhabitants, as ascertained by the last preceding census. Having been apportioned, provision was made for the imposition of the tax upon the subjects specified in the act, fixing its total sum.

In 1798, when the first direct tax was imposed, the total amount was fixed at two millions of dollars;* in 1813, the amount of the second direct tax was fixed at three millions;† in 1815, the amount of the third at six millions, and it was made an annual tax;‡ in 1816, the provision making the tax annual was repealed by the repeal of the first section of the act of 1815, and the total amount was fixed for that year at three millions of dollars.§ No other direct tax was imposed until 1861, when a direct tax of twenty millions of dollars was laid and made annual;‖ but the pro-

---

* Act of July 14th, 1798, 1 Stat. at Large, 597.
† Act of August 2d, 1813, 3 Ib. 53.
‡ Act of July 9th, 1815, Id. 164.
§ Act of March 5th, 1816, Id. 255.
‖ Act of August 5th, 1861, 12 Ib. 294.

vision making it annual was suspended, and no tax, except that first laid was ever apportioned. In each instance, the total sum was apportioned among the States, by the constitutional rule, and was assessed at prescribed rates, on the subjects of the tax. These subjects, in 1798,* 1813,† 1815,‡ 1816,§ were lands, improvements, dwelling-houses, and slaves; and in 1861, lands, improvements, and dwelling-houses only. Under the act of 1798, slaves were assessed at fifty cents on each; under the other acts, according to valuation by assessors.

This review shows that personal property, contracts, occupations, and the like, have never been regarded by Congress as proper subjects of direct tax. It has been supposed that slaves must be considered as an exception to this observation. But the exception is rather apparent than real. As persons, slaves were proper subjects of a capitation tax, which is described in the Constitution as a direct tax; as property they were, by the laws of some, if not most of the States, classed as real property, descendible to heirs. Under the first view, they would be subject to the tax of 1798, as a capitation tax; under the latter, they would be subject to the taxation of the other years as realty. That the latter view was that taken by the framers of the acts after 1798, becomes highly probable, when it is considered, that in the States where slaves were held, much of the value which would otherwise have attached to land passed into the slaves. If, indeed, the land only had been valued without the slaves, the land would have been subject to much heavier proportional imposition in those States than in States where there were no slaves; for the proportion of tax imposed on each State was determined by population, without reference to the subjects on which it was to be assessed.

The fact, then, that slaves were valued, under the acts referred to, far from showing, as some have supposed, that Congress regarded personal property as a proper object of

---

\* Act of July 9th, 1798, 1 Stat. at Large, 586.

† Act of July 22d, 1813, 3 Ib. 26.

‡ Id. 166.                        § Id. 255.

direct taxation under the Constitution, shows only that Congress, after 1798, regarded slaves, for the purposes of taxation, as realty.

It may be rightly affirmed, therefore, that in the practical construction of the Constitution by Congress, direct taxes have been limited to taxes on land and appurtenances, and taxes on polls, or capitation taxes.

And this construction is entitled to great consideration, especially in the absence of anything adverse to it in the discussions of the Convention which framed, and of the conventions which ratified, the Constitution.

What does appear in those discussions, on the contrary, supports the construction. Mr. Madison informs us,* that Mr. King asked what was the precise meaning of direct taxation, and no one answered. On another day, when the question of proportioning representation to taxation, and both to the white and three-fifths of the slave inhabitants, was under consideration, Mr. Ellsworth said: "In case of a poll tax, there would be no difficulty;" and, speaking doubtless of direct taxation, he went on to observe: "The sum allotted to a State may be levied without difficulty, according to the plan used in the State for raising its own supplies." All this doubtless shows uncertainty as to the true meaning of the term direct tax; but it indicates, also, an understanding that direct taxes were such as may be levied by capitation, and on lands and appurtenances; or, perhaps, by valuation and assessment of personal property upon general lists. For these were the subjects from which the States at that time usually raised their principal supplies.

This view received the sanction of this court two years before the enactment of the first law imposing direct taxes *eo nomine.*

During the February Term, 1796, the constitutionality of the act of 1794, imposing a duty on carriages, came under consideration in the case of *Hylton* v. *The United States.*† Suit was brought by the United States against Daniel Hyl-

---

* 3 Madison Papers, 1337.          † 3 Dallas, 171.

ton, to recover the penalty imposed by the act for not re-
turning and paying duty on a number of carriages, for the
conveyance of persons, kept by the defendant for his own use.
The law did not provide for the apportionment of the tax,
and, if it was a direct tax, the law was confessedly unwar-
ranted by the Constitution. The only question in the case,
therefore, was, whether or not the tax was a direct tax.

The case was one of great expectation, and a general
interest was felt in its determination. It was argued, in
support of the tax, by Lee, Attorney-General, and Hamilton,
recently Secretary of the Treasury; in opposition to the tax,
by Campbell, Attorney for the Virginia District, and Inger-
soll, Attorney-General of Pennsylvania.

Of the justices who then filled this bench, Ellsworth,
Paterson, and Wilson had been members, and conspicuous
members, of the Constitutional Convention, and each of the
three had taken part in the discussions relating to direct tax-
ation. Ellsworth, the Chief Justice, sworn into office that
morning, not having heard the whole argument, declined
taking part in the decision. Cushing, senior Associate
Justice, having been prevented, by indisposition, from at-
tending to the argument, also refrained from expressing an
opinion. The other judges delivered their opinions in suc-
cession, the youngest in commission delivering the first, and
the oldest the last.

They all held that the tax on carriages was not a direct
tax, within the meaning of the Constitution. Chase, Jus-
tice, was inclined to think that the direct taxes contemplated
by the Constitution are only two: a capitation or poll tax,
and a tax on land. He doubted whether a tax by a general
assessment of personal property can be included within the
term direct tax. Paterson, who had taken a leading part
in the Constitutional Convention, went more fully into the
sense in which the words, giving the power of taxation,
were used by that body. In the course of this examination
he said:

" Whether direct taxes, in the sense of the Constitution,
comprehend any other tax than a capitation tax, and tax on

land, is a questionable point. If Congress, for instance, should tax, in the aggregate or mass, things that generally pervade all the States in the Union, then, perhaps, the rule of apportionment would be the most proper, especially if an assessment was to intervene. This appears from the practice of some of the States to have been considered as a direct tax. Whether it be so, under the Constitution of the United States, is a matter of some difficulty; but as it is not before the court, it would be improper to give any decisive opinion upon it. I never entertained a doubt that the principal—I will not say the only—objects that the framers of the Constitution contemplated as falling within the rule of apportionment, were a capitation tax and a tax on land."*

Iredell, J., delivering his opinion at length, concurred generally in the views of Justices Chase and Paterson. Wilson had expressed his opinion to the same general effect, when giving the decision upon the circuit, and did not now repeat them. Neither Chief Justice Ellsworth nor Justice Cushing expressed any dissent; and it cannot be supposed if, in a case so important, their judgments had differed from those announced, that an opportunity would not have been given them by an order for reargument to participate in the decision.

It may be safely assumed, therefore, as the unanimous judgment of the court, that a tax on carriages is not a direct tax. And it may further be taken as established upon the testimony of Paterson, that the words direct taxes, as used in the Constitution, comprehended only capitation taxes, and taxes on land, and perhaps taxes on personal property by general valuation and assessment of the various descriptions possessed within the several States.

It follows necessarily that the power to tax without apportionment extends to all other objects. Taxes on other objects are included under the heads of taxes not direct, duties, imposts, and excises, and must be laid and collected by the rule of uniformity. The tax under consideration is a tax on bank

---

* 3 Dallas, 177.

circulation, and may very well be classed under the head of duties.   Certainly it is not, in the sense of the Constitution, a direct tax.   It may be said to come within the same category of taxation as the tax on incomes of insurance companies, which this court, at the last term, in the case of *Pacific Insurance Company* v. *Soule*\* held not to be a direct tax.

Is it, then, a tax on a franchise granted by a State, which Congress, upon any principle exempting the reserved powers of the States from impairment by taxation, must be held to have no authority to lay and collect?

We do not say that there may not be such a tax.   It may be admitted that the reserved rights of the States, such as the right to pass laws, to give effect to laws through executive action, to administer justice through the courts, and to employ all necessary agencies for legitimate purposes of State government, are not proper subjects of the taxing power of Congress.   But it cannot be admitted that franchises granted by a State are necessarily exempt from taxation; for franchises are property, often very valuable and productive property; and when not conferred for the purpose of giving effect to some reserved power of a State, seem to be as properly objects of taxation as any other property.

But in the case before us the object of taxation is not the franchise of the bank, but property created, or contracts made and issued under the franchise, or power to issue bank bills.   A railroad company, in the exercise of its corporate franchises, issues freight receipts, bills of lading, and passenger tickets; and it cannot be doubted that the organization of railroads is quite as important to the State as the organization of banks.   But it will hardly be questioned that these contracts of the company are objects of taxation within the powers of Congress, and not exempted by any relation to the State which granted the charter of the railroad.   And it seems difficult to distinguish the taxation of notes issued for circulation from the taxation of these railroad contracts.   Both descriptions of contracts are means

---

\* 7 Wallace, 434.

of profit to the corporations which issue them; and both, as we think, may properly be made contributory to the public revenue.

It is insisted, however, that the tax in the case before us is excessive, and so excessive as to indicate a purpose on the part of Congress to destroy the franchise of the bank, and is, therefore, beyond the constitutional power of Congress.

The first answer to this is that the judicial cannot prescribe to the legislative departments of the government limitations upon the exercise of its acknowledged powers. The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. So if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot, for that reason only, be pronounced contrary to the Constitution.

But there is another answer which vindicates equally the wisdom and the power of Congress.

It cannot be doubted that under the Constitution the power to provide a circulation of coin is given to Congress. And it is settled by the uniform practice of the government and by repeated decisions, that Congress may constitutionally authorize the emission of bills of credit. It is not important here, to decide whether the quality of legal tender, in payment of debts, can be constitutionally imparted to these bills; it is enough to say, that there can be no question of the power of the government to emit them; to make them receivable in payment of debts to itself; to fit them for use by those who see fit to use them in all the transactions of commerce; to provide for their redemption; to make them a currency, uniform in value and description, and convenient and useful for circulation. These powers, until recently, were only partially and occasionally exercised. Lately, however, they have been called into full activity, and Congress has undertaken to supply a currency for the entire country.

The methods adopted for the supply of this currency were briefly explained in the first part of this opinion. It now.

consists of coin, of United States notes, and of the notes of the National banks.  Both descriptions of notes may be properly described as bills of credit, for both are furnished by the government; both are issued on the credit of the government; and the government is responsible for the redemption of both; primarily as to the first description, and immediately upon default of the bank, as to the second. When these bills shall be made convertible into coin, at the will of the holder, this currency will, perhaps, satisfy the wants of the community, in respect to a circulating medium, as perfectly as any mixed currency that can be devised.

Having thus, in the exercise of undisputed constitutional powers, undertaken to provide a currency for the whole country, it cannot be questioned that Congress may, constitutionally, secure the benefit of it to the people by appropriate legislation.  To this end, Congress has denied the quality of legal tender to foreign coins, and has provided by law against the imposition of counterfeit and base coin on the community.  To the same end, Congress may restrain, by suitable enactments, the circulation as money of any notes not issued under its own authority.  Without this power, indeed, its attempts to secure a sound and uniform currency for the country must be futile.

Viewed in this light, as well as in the other light of a duty on contracts or property, we cannot doubt the constitutionality of the tax under consideration.

The three questions certified from the Circuit Court of the District of Maine must, therefore, be answered

AFFIRMATIVELY.

Mr. Justice NELSON, with whom concurred Mr. Justice DAVIS, dissenting.

I am unable to concur in the opinion of a majority of the court in this case.

The Veazie Bank was incorporated by the legislature of the State of Maine, in 1848, with a capital of $200,000, and was invested with the customary powers of a banking institution; and, among others, the power of receiving deposits,

discounting paper, and issuing notes or bills for circulation. The constitutional authority of the State to create these institutions, and to invest them with full banking powers, is hardly denied.. But, it may be useful to recur for a few moments to the source of this authority.

The tenth amendment to the Constitution is as follows: " The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." On looking into the Constitution, it will be found that there is no clause or provision which either expressly, or by reasonable implication, delegates this power to the Federal Government, which originally belonged to the States, nor which prohibits it to them. In the discussions on the subject of the creation of the first Bank of the United States, in the first Congress, and in the Cabinet of Washington, in 1790 and 1791, no question was made as to the constitutionality of the State banks. The only doubt that existed, and which divided the opinion of the most eminent statesmen of the day, many of whom had just largely participated in the formation of the Constitution, the government under which they were then engaged in organizing, was, whether or not Congress possessed a concurrent power to incorporate a banking institution of the United States?

Mr. Hamilton, in his celebrated report on a National bank to the House of Representatives, discusses at some length the question, whether or not it would be expedient to substitute the Bank of North America, located in Philadelphia, and which had accepted a charter from the legislature of Pennsylvania, in the place of organizing a new bank. And, although he finally came to the conclusion to organize a new one, there is not a suggestion, or intimation, as to the illegality or unconstitutionality of this State bank.

The act incorporating this bank, passed February 25th, 1791, prohibited the establishment of any other by Congress, during its charter, but said nothing as to the State banks. A like prohibition is contained in the act incorporating the Bank of the United States of 1816. The constitutionality of a

bank incorporated by Congress was first settled by the judgment of this court in *McCulloch* v. *The State of Maryland*,* in 1819. In that case both the counsel and the court recognize the legality and constitutionality of banks incorporated by the States.

The constitutionality of the Bank of the United States was again discussed, and decided in the case of *Osborn* v. *United States Bank*.† And, in connection with this, was argued and decided a point in the case of *The United States Bank* v. *The Planters' Bank of Georgia*, which was common to both cases. The question was, whether the Circuit Courts of the United States had jurisdiction of a suit, brought by the United States Bank against the Planters' Bank of Georgia, incorporated by that State, and in which the State was a stockholder.‡

The court held in both cases that it had. Since the adoption of the Constitution, down to the present act of Congress, and the case now before us, the question in Congress and in the courts has been, not whether the State banks were constitutional institutions, but whether Congress had the power conferred on it by the States, to establish a National bank. As we have said, that question was closed by the judgment of this court in *McCulloch* v. *The State of Maryland*. At the time of the adoption of the Constitution, there were four State banks in existence and in operation—one in each of the States of Pennsylvania, New York, Massachusetts, and Maryland. The one in Philadelphia had been originally chartered by the Confederation, but subsequently took a charter under the State of Pennsylvania. The framers of the Constitution were, therefore, familiar with these State banks, and the circulation of their paper as money; and were also familiar with the practice of the States, that was so common, to issue bills of credit, which were bills issued by the State, exclusively on its own credit, and intended to circulate as currency, redeemable at a future day. They guarded the people against the evils of this practice of the State governments

---

: * 4 Wheaton, 316.     † 9 Id. 738.     ‡ Ib. 804, 904.

by the provision in the tenth section of the first article, "that no State shall" "emit bills of credit," and, in the same section, guard against any abuse of paper money of the State banks in the following words: "nor make anything but gold and silver coin a tender in payment of debts." As bills of credit were thus entirely abolished, the paper money of the State banks was the only currency or circulating medium to which this prohibition could have had any application, and was the only currency, except gold and silver, left to the States. The prohibition took from this paper all coercive circulation, and left it to stand alone upon the credit of the banks.

It was no longer an irredeemable currency, as the banks were under obligation, including, frequently, that of its stockholders, to redeem their paper in circulation, in gold or silver, at the counter. The State banks were left in this condition by the Constitution, untouched by any other provision. As a consequence, they were gradually established in most or all of the States, and had not been encroached upon or legislated against, or in any other way interfered with, by acts of Congress, for more than three-quarters of a century—from 1787 to 1864.

But, in addition to the above recognition of the State banks, the question of their constitutionality came directly before this court in the case of *Briscoe* v. *The Bank of the Commonwealth of Kentucky.**

The case was most elaborately discussed, both by counsel and the court. The court, after the fullest consideration, held that the States possessed the power to grant charters to State banks; that the power was incident to sovereignty; and that there was no limitation in the Federal Constitution on its exercise by the States. The court observed that the Bank of North America and of Massachusetts, and some others, were in operation at the time of the adoption of the Constitution, and that it could not be supposed the notes of these banks were intended to be inhibited by that instrument, or, that

---

* 11 Peters, 257.

they were considered as bills of credit within its meaning. All the judges concurred in this judgment, except Mr. Justice Story.    The decision in this case was affirmed in *Woodruff* v. *Trapnall ;** in *Darrington* v. *The Bank of Alabama ;†* and in *Curran* v. *State of Arkansas.‡*

Chancellor Kent observes, that Mr. Justice Story, in his Commentaries on the Constitution,§ seems to be of opinion that independent of the long-continued practice, from the time of the adoption of the Constitution, the States would not, upon a sound construction of the Constitution, if the question was *res integra*, be authorized to incorporate banks with a power to circulate bank paper as currency, inasmuch as they are expressly prohibited from coining money.    He cites the opinions of Mr. Webster, of the Senate of the United States, and of Mr. Dexter, formerly Secretary of War, on the same side.    But the Chancellor observes, that the equal, if not the greater, authority of Mr. Hamilton, the earliest Secretary of the Treasury, may be cited in support of a different opinion ; and the contemporary sense and uniform practice of the nation are decisive of the question.    He further observes, the prohibition (of bills of credit) does not extend to bills emitted by individuals, singly or collectively, whether associated under a private agreement for banking purposes, as was the case with the Bank of New York, prior to its earliest charter, which was in the winter of 1791, or acting under a charter of incorporation, so long as the State lends not its credit, or obligation, or coercion to sustain the circulation.

In the case of *Briscoe* v. *The Bank of the Commonwealth of Kentucky*, he observes, that this question was put at rest by the opinion of the court, that there was no limitation in the Constitution on the power of the States to incorporate banks, and their notes were not intended nor were considered *as bills of credit.*‖

The constitutional power of the States, being thus estab-

---

* 10 Howard, 205.      † 13 Id. 12.      ‡ 15 Id. 317.      § Vol. 3, p. 19.
‖ 1 Kent's Commentaries, p. 409, marg. note A, 10th ed.

lished by incontrovertible authority, to create State banking institutions, the next question is, whether or not the tax in question can be upheld, consistently with the enjoyment of this power.

The act of Congress, July 13th, 1866,* declares, that the State banks shall pay ten per centum on the amount of their notes, or the notes of any person, or other State bank, used for circulation, and paid out by them after the 1st of August, 1866. In addition to this tax, there is also a tax of five per centum per annum, upon all dividends to stockholders,† besides a duty of one twenty-fourth of one per centum, monthly, upon all deposits, and the same monthly duty upon the capital of the bank.‡ This makes an aggregate of some sixteen per cent. imposed annually upon these banks. It will be observed, the tax of ten per centum upon the bills in circulation is not a tax on the property of the institutions. The bills in circulation are not the property, but the debts of the bank, and, in their account of debits and credits, are placed to the debit side. Certainly, no government has yet made the discovery of taxing both sides of this account, debit and credit, as the property of a taxable person or corporation. If both these items could be made available for this purpose, a heavy National debt need not create any very great alarm, neither as it respects its pressure on the industry of the country, for the time being, or of its possible duration. There is nothing in the debts of a bank to distinguish them in this respect from the debts of individuals or persons. The discounted paper received for the notes in circulation is the property of the bank, and is taxed as such, as is the property of individuals received for their notes that may be outstanding.

The imposition upon the banks cannot be upheld as a tax upon property; neither could it have been so intended. It is, simply, a mode by which the powers or faculties of the States, to incorporate banks, are subjected to taxation, and, which, if maintainable, may annihilate those powers.

* 14 Stat. at Large, 146, § 9.          † 13 Id. p. 283, § 120.
‡ Ib. 277, § 110.

No person questions the authority of Congress to tax the property of the banks, and of all other corporate bodies of a State, the same as that of individuals. They are artificial bodies, representing the associated pecuniary means of real persons, which constitute their business capital, and the property thus invested is open and subject to taxation, with all the property, real and personal, of the State. A tax upon this property, and which, by the Constitution, is to be uniform, affords full scope to the taxing power of the Federal government, and is consistent with the power of the States to create the banks, and, in our judgment, is the only subject of taxation, by this government, to which these institutions are liable.

As we have seen, in the forepart of this opinion, the power to incorporate banks was not surrendered to the Federal Government, but reserved to the States; and it follows that the Constitution itself protects them, or should protect them, from any encroachment upon this right. As to the powers thus reserved, the States are as supreme as before they entered into the Union, and are entitled to the unrestrained exercise of them. The question as to the taxation of the powers and faculties belonging to governments is not new in this court. The bonds of the Federal Government have been held to be exempt from State taxation. Why? Because they were issued under the power in the Constitution to borrow money, and the tax would be a tax upon this power; and, as there can be no limitation to the extent of the tax, the power to borrow might be destroyed. So, in the instance of the United States notes, or legal tenders, as they are called, issued under a constructive power to issue bills of credit, as no express power is given in the Constitution, they are exempt from State taxation for a like reason as in the case of government bonds; and, we learn from the opinion of the court in this case, that one step further is taken, and that is, that the notes of the National banks are to be regarded as bills of credit, issued indirectly by the government; and it follows, of course, from this, that the banks used as instruments to issue and put in circulation

these notes, are also exempt. We are not complaining of this. Our purpose is to show how important it is to the proper protection of the reserved rights of the States, that these powers and prerogatives should be exempt from Federal taxation, and how fatal to their existence, if permitted. And, also, that even if this tax could be regarded as one upon property, still, under the decisions above referred to, it would be a tax upon the powers and faculties of the States to create these banks, and, therefore, unconstitutional.

It is true, that the present decision strikes only at the power to create banks, but no person can fail to see that the principle involved affects the power to create any other description of corporations, such as railroads, turnpikes, manufacturing companies, and others.

This taxation of the powers and faculties of the State governments, which are essential to their sovereignty, and to the efficient and independent management and administration of their internal affairs, is, for the first time, advanced as an attribute of Federal authority. It finds no support or countenance in the early history of the government, or in the opinions of the illustrious statesmen who founded it. These statesmen scrupulously abstained from any encroachment upon the reserved rights of the States; and, within these limits, sustained and supported them as sovereign States.

We say nothing, as to the purpose of this heavy tax of some sixteen per centum upon the banks, ten of which we cannot but regard as imposed upon the power of the States to create them. Indeed, the purpose is scarcely concealed, in the opinion of the court, namely, to encourage the National banks. It is sufficient to add, that the burden of the tax, while it has encouraged these banks, has proved fatal to those of the States; and, if we are at liberty to judge of the purpose of an act, from the consequences that have followed, it is not, perhaps, going too far to say, that these consequences were intended.