White, C. J.
The plaintiff is a banking corporation organized under the act of Congress “ to provide a national currency, secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof,” approved June 3, 1864. 13 Stat. at Large, 99.
The judgment of the court below is sought to be sustained on three general grounds :
First. That the note in question having been discounted by the plaintiff at an unlawful rate of interest, is void under the act of Congress referred to.
Second. That, if not void under that act, the note is void under the statute of this state, passed March 19, 1850, entitled “ an act to restrain banks from taking usury.” 1 S. & C. 149.
Third. That the defendants being sureties, the discounting of the note by the plaintiff' for their principal, at an unlawful rate of iuterest, was an unauthorized use of the note which discharged them from liability thereon.
These grounds we will consider in their order.
1. The sections of the national banking law preceding section 8 prescribe the mode in which associations may be formed “for carrying on the business of banking.” By *501 section 8 the associations so formed are, among other things, authorized to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits, by buying, selling exchange, coin, and bullion; by loaning money on personal security ; by obtaining, issuing, and circulating notes according to the - provisions of the act, etc.
Section 30 is a limitation of the general powers specified in section 8; and on the construction of the former section, the question now under consideration depends.
Section 30 is as follows:
“ Sec. 30. And be it further enacted, that every association may take, receive, reserve, and charge on any loau or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at the rate allowed by the laws of the state or territory where the bank is located, and no more, except that where, by the law of any state, a different rate is limited for banks of issue organized under state laws, the rate so limited shall be allowed for associations organized in any such state under this act. And when no rate is fixed by the laws of the state or territory, the bank may take, receive, or charge a rate not exceeding seven per centum, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run. And the knowingly taking, receiving, or reserving, or charging a rate greater than aforesaid, shall be held and adjudged a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. And in case a greater rate of interest has been paid, the person or persons paying the same, or their legal representatives, may recover back in an action of debt twice the amount of the interest thus paid from the association taking or receiving the same. Provided, that such action is commenced within two years from the time the usurious transaction occurred. But the purchase, discount, or sale of a bona fide bill of exchange payable at another place than the place of such *502 purchase, discount, or sale, at not more than the current rate of exchange payable at another place than the place of purchase, discount, or sale, at not more than current rate of exchange for sight drafts, in addition to the interest, shall not be considered as taking or receiving a greater rate of interest.”
This section is a substitute for section 46 of the original act of February 25,1863 ; and in giving construction to the section as found in the present act, it is worthy of remark that the forfeiture, as declared by the original act, was of the entire debt or demand on which the interest was taken, reserved, or charged.
The effect of agreeing for unlawful interest, as the section now stands, is quite obvious. The forfeiture is expressly limited to the interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. In thus limiting the forfeiture to the interest, the right of the bank to the principal is necessarily implied. And so far as the argument as to the entire invalidity of the note is founded on the supposed want of power or capacity in the bank, it is enough to say that authority implied is as effective and available as authority expressly conferred.
The statute operates on the instrument given for the loan, and, in effect, declares it to be invalid as to the entire interest, but valid and binding as an obligation for the payment of the principal.
The construction we give to the statute now under consideration, renders the decision in the case of The Bank of Chillicothe v. Swayne et al., 8 Ohio, 286, and the subsequent cases referred to, recognizing the same principle, inapplicable to the present case. In each of those cases the contract was declared void, not because of any illegal element or stipulation entering into the consideration of the instrument, but for want of legal capacity on the part of the corporation to make a contract in derogation of the authority conferred by its charter. Selsor v. Brock, 8 Ohio St. 306
We have not overlooked the recent case of Lamb v. First National Bank of Whitehall, decided by the Court of *503 Appeals of New York. "We have considered the opinion in that case with the respect due to the learned tribunal in which it was pronounced. But after an attentive consideration of it, we are unable to concur in the views therein expressed as to the true construction of the act of Congress now in question. The question decided in the case was that the contract then in controversy was void under the usury laws of New York. The contract was usurious both under the laws of the State and the law of Congress. The usurious part of the transaction was forbidden by both law's, the difference in their operation being as to the extent of the penalty or forfeiture. The statutes of New York declare void all contracts reserving a greater rate of interest than seven per cent, per annum, and preclude a recovery thereon of either principal or interest. In this state we have no such statute. Whether, therefore, it is competent for the state to impose additional penalties or forfeitures to those prescribed by Congress, where the authority given by Congress has been exceeded in the usurious transaction, is a question which does not arise in this case, and as to which we express no opinion.
The construction given to section 30, in Lamb v. Whitehall, to which we dissent, is in limiting the operation of the clause declaring the forfeiture to states and territories, where, by the local law, no rate of interest is fixed.
' The preceding clauses prescribe the rate of interest to govern in all eases. Where the local law prescribes no rate of interest, it is declared that the rate allowed shall be seven per centum. In all other eases the rate fixed by the local law is adopted by Congress to govern the national banks. It seems to us that, upon a fair construction of the section, the operation of the clause declaring the forfeiture, must be regarded -as co-extensive with the authority conferred in the preceding clauses as to exacting interest; and as applying to all loans and discounts made under these clauses, irrespective of the locality in which they are made.
The construction given tq the section in the opinion referred to, of the Court of Appeals, seems to have been *504 influenced by the idea, that unless the forfeiting clause was limited to cases where by the local law no rate of interest is fixed, the provision would be unconstitutional. But we do not perceive that the question of constitutional power is varied by such limitation. If, in the absence of a state law fixing the rate of interest, Congress has power to prescribe arate of interest for the banks, and the consequences of taking interest in excess of the rate allowed, the power must be derived from the constitution of the United States; and, if so derived, its exercise can not be made dependent on state authority. If, therefore, the power exists in Congress to prescribe for the national banks a rate of interest in any of the states, the power must exist to the same extent in all the states, irrespective of the rates prescribed by state laws.
The question whether Congress had power to establish the national banks, must be regarded, by the judicial tribunals, as settled by the repeated decisions of the Supreme Court of the United States. McCulloch v. The State of Maryland, 4 Wheat. 316; Osborn v. United States Bank, 9 Ib. 738; Veazie v. Fenno, 8 Wall. 533.
Iu speaking of the faculty of lending and dealing in money which Congress was authorized, to confer upon the United States Bank, Chief Justice Marshall uses this language :
“Why is it that Congress can incorporate or create a bank? This question was answered in the case of McCulloch v. The State of Maryland. It is an instrument which Ms necessary and proper’ for carrying on the fiscal operations of government. Can this instrument, on any rational calculation, effect its object, unless it be endowed with that faculty of lending and dealing in money, which is conferred by its charter? If it can, if it be as competent to the purposes of government without, as with this faculty, there will be much difficulty in sustaining that essential part of the charter. If it can not, then this faculty is necessary to the legitimate operations of government, and was constitutionally and rightfully ingrafted on the institution. It is in that view of the subject the vital part of the corporation; *505 it is its soul; and the right to preserve it originates in the same principle with the right to preserve the skeleton or body which it animates. The distinction between destroying what is denominated the corporate franchise, and destroying its vivifying principle, is precisely as incapable of being maintained, as a distinction between the right to sentence a human being to death, and a right to sentence him to a total privation of sustenance during life. Deprive a bank of its trade and business, which is its sustenance, and its immortality, if it have that property, will be a very useless attribute.
“ This distinction, then, has no real existence. To tax its faculties, its trade and occupation, is to tax the bank itself To destroy or preserve the one, is to destroy or preserve the other. . . .
“The currency which it (the bank) circulates, by means of its trade with individuals, is believed to make it a more fit instrument for the purposes of government, than it could otherwise be; and if this be true, the capacity to carry on this trade, is a faculty indispensable to the character and object of the institution.” 9 Wheat. 861-4.
In Veazie v. Fenno, supra, in the opinion delivered by the present Chief Justice, referring to the national banking system, it is said:
“ The methods adopted for the supply of this currency were briefly explained in the first part of this opinion. It now consists of coin, of United States notes, and of the notes of the national banks. Both descriptions of notes may be properly described as bills of credit, for both are furnished by the government; both are issued upon the credit of the government; and the government is responsible for the redemption of both; primarily as to the first described, and immediately upon default of the bank as to the second......Having thus, in the exercise of undisputed constitutional powers, undertaken to provide a currency for the whole country, it can not be questioned that Congress may constitutionally secure the benefit of it to the people, by appropriate legislation.”
*506 It being thus established, that Congress can provide a national currency through the agency of the banks, and authorize them to put it in circulation, it seems to us necessarily to follow that it can prescribe the terms or rate of interest upon which it is to be supplied and kept in circulation.
The power to create, implies the power to preserve. The lending the currency they issue, is a vital element in the system of national banks, and the right to take interest is a necessary incident of the power to loan. If the states can, in derogation of the act of Congress, limit the capacity or right of the banks as to the rate of iuterest they may charge, the states would seem to have plenary power over the whole subject; and could so exercise it, if they saw proper, as to destroy, for all practical purposes, the value of the franchise. The power would seem to extend not only to prescribing the rate of interest, but to include also authority to prescribe the character of the securities to be discounted by the banks, and the terms in all other respects on which they were to exercise the power to loan.
2. The next question is, whether the statute of this state of March 19, 1850, already refereed to, affects the note now in question. We are clearly of opinion that it does not. The third section of the act, which is the only one that can be supposed to have any application, was intended to operate on banking institutions in this state whose authority to discount or purchase notes, bills, or other evidences of debt, was subject to the control of the legislation of this state, and was intended to limit such authority. It imposes no penalty. It has no application to banking institutions existing and exercising their power under the authority of Congress.
3. The remaining question is, whether the discounting of the note, at an illegal rate of interest, was such a misuse of the note as discharged the defendants as sureties from liability.
This question was determined in the negative by this court, in Selsor v. Brock, 3 Ohio St. 302. It was held in that *507 case, that where a joint and several promissory note in blank is signed by several persons as sureties, and delivered to the principal debtor, to be by him filled up and given to the payee, if an illegal rate of interest be agreed upon between the principal debtor and the creditor, and incorporated in the amount for which the note is made payable, the contract is voidable to the extent of the usury only, and creates a binding obligation on the part of the surety for the principal and legal interest, whether the usury be inserted with the knowledge and consent of the surety or not.
Usury, it is said in the opinion, will not avoid a contract as to a surety beyond the extent to which it is vitiated as to the principal. And it may be remarked that, in this state, the effect of usury is not to vitiate the entire contract, but only to the extent of the usury.
It may be inferred from the answer that the note in the present case was filled up at the time it was signed by the sureties. But it can make no difference in principle whether the note is made to cover illegal interest by filling it up if it is in blank, for a larger amount than the actual loan and lawful interest, or, where it is already written out, by diminishing the amount of the actual loan. The effect is the same in either case.
It is not averred in the answer that there was any agreement between the defendants and Garlinghouse, the principal, that the note was not to be used uuless it could be discounted at the legal rate of interest. The averment is that the defendants executed the note for the accommodation of their principal, for the purpose ouly of having it discounted at that rate. Whether this purpose was communicated to the principal does not appear. In the absence of any express agreement or understanding between the sureties and the principal, of which the creditor had notice, and of any intention to practice a fraud on the sureties, they must be held to have trusted to the judgment and discretion of the principal as to the terms on which the note might be discounted.
*508 Judgment reversed and cause remanded for further proceedings.
Day, J., did not sit in this case.