Alco Parking Corporation et al., Appellants, *v.* Pittsburgh.

Argued March 14, 1973. Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy, Nix and Manderino, JJ.

August 7, 1973, order per curiam, Mr. Justice EAGEN dissenting.

*Leonard M. Marks,* of the New York Bar, and *Leonard Boreman,* with them *Richard H. Martin, Gold, Farrell & Marks,* and *Baskin, Boreman, Sachs, Wilner, Gondelman & Craig,* for appellants.

*Ralph Lynch, Jr.,* City Solicitor, with him *Grace S. Harris,* Special Assistant Solicitor, for appellee.

OPINION BY MR. JUSTICE ROBERTS, July 2, 1973:

This controversy presents the interesting and novel question of whether the enactment, by a municipal government, of a 20 percent gross receipts tax upon all non-residential, commercial parking facilities in that municipality, combined with direct governmental com-

petition in the form of a public parking authority, charging lower rates, has resulted in an unconstitutional taking and confiscation of private property without due process of law.

Appellants are twelve owners and operators of parking lots and garages representing approximately 71 percent of the total commercial parking spaces in downtown Pittsburgh. On February 20, 1970, appellants filed a complaint in equity in the Allegheny County Court of Common Pleas seeking to restrain the City of Pittsburgh (appellee) from enforcing the provisions of Ordinance No. 704 (Parking Tax Ordinance), and seeking a refund of all taxes paid thereunder. The Parking Tax Ordinance, approved by the Pittsburgh City Council on December 31, 1969, and enacted pursuant to the Local Tax Enabling Act, Act of December 31, 1965, P. L. 1257, §§1 et seq., 53 P.S. §§6901 et seq., imposed a tax of 20 percent on the gross receipts of all non-residential commercial parking transactions within the city limits.

This Parking Tax Ordinance (No. 704) superseded and replaced Ordinance No. 675, enacted by the City of Pittsburgh in 1968 establishing a gross receipts tax of 15 percent on all non-residential commercial parking transactions in the city. Ordinance No. 675, in turn, had replaced Ordinance No. 434, which had originally established the gross receipts tax rate of 10 percent.

In their complaint in equity appellants asserted (1) that the Parking Tax Ordinance was so excessive and unreasonable that it amounted to a confiscation of appellants' property without due process of law, and (2) that the Ordinance violated Article VIII, Section 1 of the Pennsylvania Constitution,[1] and the equal pro-

---

[1] "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Constitution of Pennsylvania, Article VIII, Section 1.

tection clause of the Fourteenth Amendment of the United States Constitution in that the city had no reasonable basis for separately classifying appellants' commercial parking operations for the purpose of taxation. After a trial the Allegheny County Court of Common Pleas issued a Decree Nisi, on March 19, 1971, dismissing appellants' complaint, having found no taking of property without due process, and no violation of either the Pennsylvania or the United States Constitutions. Appellants' timely filed exceptions to the decree were dismissed by the court en banc on July 11, 1971, whereupon a final decree was entered.

Appellants then appealed to the Commonwealth Court which affirmed the decree of the common pleas court on June 8, 1972, by a vote of four to three. Appellants' petition for reargument was granted by the Commonwealth Court on June 29, 1972. However, after reargument the Commonwealth Court adhered to its prior decision, affirming the chancellor's decree on October 10, 1972. Subsequently, on November 6, 1972, appellants filed a petition for allowance of appeal with this Court. That petition was granted on January 23, 1973. We now reverse and remand.

## I.

Appellee, the City of Pittsburgh, contends, initially, that this Court lacks jurisdiction to hear this appeal because appellants' petition for allowance of appeal was not timely filed. See *Nardo v. Smith,* 448 Pa. 38, 292 A. 2d 377 (1972). Consequently appellee has moved to quash this appeal. In its motion to quash appellee alleges that appellants' petition for allocatur was not filed until November 6, 1972, almost five months after the issuance of the final order and opinion of the Commonwealth Court of June 8, 1972—clearly not within the 30-day time limit for perfecting an appeal as pro-

vided by statute. See Act of July 31, 1970, P. L. 673, art. V, §502, 17 P.S. §211.502 (Supp. 1972).

Appellee's contention is that the grant of the petition for reargument by the Commonwealth Court on June 29, 1972 (within the 30-day appeal period), unless accompanied by an order staying the proceedings, does not toll the 30-day period within which appellants must file their appeal. See *Francis v. J. A. Brashear M. School Dist.*, 435 Pa. 589, 258 A. 2d 509 (1969); *Smith v. Jones*, 369 Pa. 13, 85 A. 2d 23 (1951); *Erie v. Piece of Land*, 341 Pa. 310, 17 A. 2d 399 (1941). Since no such specific stay of the proceedings was issued by the Commonwealth Court, appellee asserts that the time for perfecting the appeal expired 30 days after the original June 8, 1972 order of the Commonwealth Court, regardless of that court's grant of reargument within the 30-day period.

Appellants contend that in good faith, after reargument had been granted, they contacted the Prothonotary of the Supreme Court who advised them that a petition for allocatur should not be filed until after the Commonwealth Court's order, following reargument, had been entered. Relying upon this information appellants did not file their petition until November 6, 1972—a date within 30 days of the Commonwealth Court's order, after reargument, affirming the decree below.

While appellants may not have been justified in relying on the legal advice of a court official, nevertheless the rule of law urged upon this Court by the appellee is not only contrary to logic but to the laws of physics as well. The granting of a petition for reargument within the 30-day appeal period necessarily indicates an intention by the granting court to stay the proceedings, and is in reality such a stay, in order to keep the record before that court, during reargument, pending any change or modification of the court's initial order after reargument. In these circumstances to

require appellants to file a petition for allowance of appeal within 30 days of the original order of the Commonwealth Court would have the effect of placing them in two courts at the same moment. It is legally and physically impossible for the record in any case to be pending before two separate appellate courts of this Commonwealth simultaneously. Indeed, a reargument is clearly a reconsideration by a court of a particular case. To slavishly adhere, as the appellee insists, to a rule requiring a court to also issue an order staying the proceedings would be needlessly elevating mere form over substance.

Certainly it is illogical, as well as senseless, to require a litigant to file an appeal, or petition for allowance of appeal, to a second appellate court while his case is still pending before the first appellate court, about to reconsider his case. To compel him to do so in advance of the reargument is indeed a useless, wasteful, and premature procedure. Assuming the court's initial decision is reversed upon reargument, the litigant may not even desire to file an appeal at the later time. If an appeal is desired after the reargument, that is the appropriate time for setting the appeal procedure in motion. This Court will not mandate such a purposeless burden and expenditure of professional and judicial time and effort.

These considerations lead us inexorably to the conclusion that where, as here, the Commonwealth Court granted appellants' petition for reargument within the prescribed period, the proceedings were thereby stayed, pending a reconsideration upon the merits after reargument. Appellants' petition, filed within 30 days of the Commonwealth Court's post-reargument disposition, was therefore timely. The motion to quash the appeal is denied. To the extent that any prior decisions of this Court are inconsistent with this holding they are no longer controlling.

## II.

Appellee urges upon this Court one additional procedural objection contending that the Allegheny County Court of Common Pleas sitting in equity was not the proper court to hear this case. Appellee urges that a proceeding in equity is only proper in challenges to taxing statutes or ordinances when there is "a substantial question of constitutionality . . . and the absence of an adequate statutory remedy." *Rochester and Pittsburgh Coal Co. v. Indiana County Board of Assessment*, 438 Pa. 506, 266 A. 2d 78 (1970).[2] The City of Pitts-

---

[2] Even if appellee could raise this issue here for the first time (see text, p. 253, infra), its reliance upon *Rochester and Pittsburgh Coal Co. v. Indiana County Board of Assessment*, 438 Pa. 506, 266 A. 2d 78 (1970), appears to be somewhat misplaced. The seminal case on the question of equity jurisdiction to hear challenges to tax legislation under the Local Tax Enabling Act (Act of December 31, 1965, P. L. 1257, §6, as amended, 53 P.S. §6906), is *Lynch v. Owen J. Roberts School District*, 430 Pa. 461, 244 A. 2d 1 (1968). In *Lynch* this Court held that while normally equity is without jurisdiction to enjoin enforcement of a tax not challenged at law under the applicable statute, an exception exists "where a taxing statute is made the subject of a *constitutional* challenge." Id. at 465, 244 A. 2d at 3.

*Rochester*, decided two years later, apparently effected a sub silentio modification of *Lynch* by holding that equity only has jurisdiction when there is "a substantial question of constitutionality (and not a mere allegation) and the absence of an adequate statutory remedy." *Rochester*, supra at 508, 266 A. 2d at 79. However, *Rochester* appears to have distinguished itself as sui generis. The majority there acknowledged that a different rule was necessary because, unlike *Lynch*, *Rochester* involved a real estate tax. The majority felt in those real estate tax situations it would be preferable for an administrative body with some expertise, such as the board of assessment, to assume jurisdiction rather than an equity court. *Rochester*, supra at 509, 266 A. 2d at 79.

Moreover in *Crosson v. Downingtown Area School District*, 440 Pa. 468, 475, 270 A. 2d 377, 380 (1970), this Court, while not returning completely to the preferable rule of *Lynch*, at least modified *Rochester* in holding that even " '[w]here there is an adequate

burgh argues that the issues raised by appellants are not "substantial constitutional questions" and that appellants had a specific statutory remedy of which they failed to avail themselves. See Local Tax Enabling Act, Act of December 31, 1965, P. L. 1257, §6, as amended, 53 P.S. §6906.[3]

However, appellee did not raise this issue below and may not raise this issue here for the first time. The record clearly discloses that appellee interposed no objection to the propriety of the equity court proceeding either prior to, during, or after the trial below. In fact, one of the chancellor's express conclusions of law, to which appellee took no exception was: "This court sit-

remedy at law in this class of case, this Court has repeatedly said that *Equity should intervene only where there is . . . an* utter disregard of imperative constitutional requirements: [citations of authorities].'" (Emphasis in original). See also *Campbell v. Coatesville Area School District*, 440 Pa. 496, 270 A. 2d 385 (1970).

[3] It is not altogether clear that appellants could have proceeded under Section 6 of the Local Tax Enabling Act even had they so attempted. That section of the Act provides in pertinent part that: "No tax levied for the first time by any political subdivision to which this act applies shall go into effect until thirty days from the time of the adoption of the ordinance or resolution levying the tax. Within said thirty days, taxpayers representing twenty-five percent or more of the total valuation of real estate in the political subdivision as assessed for taxation purposes, or taxpayers of the political subdivision not less than twenty-five in number aggrieved by the ordinance or resolution shall have the right to appeal therefrom to the court of quarter sessions of the county upon giving bond with sufficient security in the amount of five hundred dollars ($500), approved by the court, to prosecute the appeal with effect and for the payment of costs." Act of December 31, 1965, P. L. 1257, §6, as amended, 53 P.S. §6906.

Certainly it is arguable whether Ordinance No. 704, merely raising the rate of a gross receipts tax already in existence since 1962, can be classified as "a tax levied for the first time," under the terms of this section. Secondly, assuming appellants in good faith were unable to muster the requisite 25 aggrieved taxpayers, they were then apparently foreclosed from challenging the tax under this statute and arguably had no statutory remedy.

ting in equity has jurisdiction of the parties and of the subject matter of this proceeding." This Court has repeatedly emphasized, and it is now beyond cavil, that "we will not review questions that were neither raised, tried, or considered in the trial court." *Robert J. Felte, Inc., v. White,* 451 Pa. 137, 302 A. 2d 347 (1973) ; *Heppe Estate,* 440 Pa. 328, 269 A. 2d 687 (1970) ; *Man O'War Racing Ass'n, Inc. v. State Horse Racing Commission,* 433 Pa. 432, 250 A. 2d 172 (1969) ; *Brenner v. Sukenik,* 410 Pa. 324, 189 A. 2d 246 (1963) ; *Clark v. Rutecki,* 408 Pa. 25, 182 A. 2d 687 (1962) ; *Bechler v. Olivia,* 400 Pa. 299, 161 A. 2d 156 (1960) ; *Rosenfeld v. Rosenfeld,* 390 Pa. 39, 133 A. 2d 829 (1957).

## III.

Proceeding to the merits of the case, appellants attack the constitutionality of the Parking Tax Ordinance on two grounds. They first contend that the Ordinance violates both the uniformity clause of the Pennsylvania Constitution and the equal protection clause of the Fourteenth Amendment of the United States Constitution. Specifically appellants assert that the Ordinance "constitutes an arbitrary use of the taxing power by [Pittsburgh] City Council in that the imposition of a separate tax on the parking business, in addition to its regular taxes, lacks *any reasonable basis.*" Moreover, appellants contend that merely because the City could, under its police power, classify the parking business separately for regulatory purposes, it does not necessarily follow that they can separately classify the parking business for purposes of taxation.

This argument, presented to and rejected by this Court on numerous prior occasions, must, once again, be rejected. It is well established that the Commonwealth and its political subdivisions, in the exercise of the taxing power, are subject to the requirements of

equal protection and uniformity. See *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 79 S. Ct. 437 (1959); *Commonwealth v. Life Assurance Co. of Pa.*, 419 Pa. 370, 214 A. 2d 209 (1965). However, the taxing authority must by necessity possess wide discretion for purposes of taxation of various businesses or occupations. *Commonwealth v. Life Assurance Co. of Pa.*, supra at 376, 214 A. 2d at 214, and the cases cited therein.

In *Life Assurance Co.*, supra, this Court noted:

"The equal protection clause imposes no iron rule of equality prohibiting that degree of flexibility and variety appropriate to reasonable schemes of taxation. Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 525, 79 S. Ct. 437, 440 (1959).

"The only constitutional limitation placed upon the power of the Legislature to distinguish between various entities for purposes of taxation is that their basis for doing so be reasonable. See Allied Stores of Ohio, Inc. v. Bowers, supra, at 527, 79 S. Ct. at 441; State Bd. of Tax Comm'rs of Indiana v. Jackson, 283 U.S. 527, 537, 51 S. Ct. 540, 543 (1931); Brown-Forman Co. v. Kentucky, 217 U.S. 563, 572, 30 S. Ct. 578, 580 (1910); Jones & Laughlin Tax Assessment Case, 405 Pa. 421, 433-34, 175 A. 2d 856, 862 (1961); Commonwealth v. Lukens, 312 Pa. 220, 223, 167 Atl. 167, 169 (1933). And the burden of showing that the classification employed by the Legislature is not reasonable is upon the party attacking the tax. Cf. Chartiers Valley Jt. Schools v. Allegheny County Bd. of School Dir's, 418 Pa. 520, 546, 211 A. 2d 487, 501 (1965). 'Especially is this so in light of the often reaffirmed rule that . . . " '[legislation] will not be declared unconstitutional unless it *clearly, palpably* and *plainly* violates the Constitution.' " ' Ibid. (Citations omitted.)" Id. at 376-77, 214 A. 2d at 214.

Moreover, the burden of proving the classification is unreasonable is a heavy one. *Amidon v. Kane*, 444 Pa.

38, 51, 279 A. 2d 53, 60 (1971); *F. J. Busse Co. v. Pittsburgh*, 443 Pa. 349, 359, 279 A. 2d 14, 19 (1971); *Philadelphia v. Depuy*, 431 Pa. 276, 279, 244 A. 2d 741, 743 (1968). "So long as the classification imposed is based upon some standard capable of reasonable comprehension, be that standard based upon ability to produce revenue or some other legitimate distinction, equal protection of the law has been afforded." *Commonwealth v. Life Assurance Co. of Pa.*, supra at 378, 214 A. 2d at 215. Merely because "a statute may discriminate in favor of a certain class does not render it arbitrary if the discrimination is founded upon a reasonable distinction, or difference in state policy. American Sugar refining Co. v. State of Louisiana, 179 U.S. 89, 21 S. Ct. 43." *Allied Stores*, supra at 528, 79 S. Ct. at 441. Thus a tax based on a reasonable classification is not unconstitutional because one class may be placed at a competitive disadvantage. *Williams and Co., Inc. v. Pittsburgh School District*, 430 Pa. 509, 514, 244 A. 2d 37, 39 (1968).

The determinative question, then, is whether the classification imposed by the Parking Tax Ordinance is a reasonable one. We said in *Commonwealth v. Life Assurance Co. of Pa.*, supra at 378-79, 214 A. 2d at 215 that: ". . . the essential question in testing the validity of such measures . . . is whether the distinctive treatment accorded rests upon substantial differences between the subjects so classified. . . . And where such distinctions rest upon differences recognized and acted upon by the business world, it is not within the province of the courts to intrude. . . . So long as the classification is neither capricious nor arbitrary, there is no denial of the equal protection of the law. . . ." (Citations omitted).

This Court has in the past sustained numerous types of distinctive tax treatment of a wide diversity of businesses and occupations. See, e.g., *Commonwealth v.*

*Lafferty,* 426 Pa. 541, 233 A. 2d 256 (1967) (contract carrier taxed differently from common carrier although engaged in similar enterprises) ; *Allentown School District Mercantile Tax Case,* 370 Pa. 161, 87 A. 2d 480 (1952) (retailers and wholesalers taxed differently) ; *DuFour v. Maize,* 358 Pa. 309, 56 A. 2d 627 (1948) (strip mining of coal taxed differently than deep mining of coal). Moreover, in 1940, this Court sustained the validity of a Philadelphia ordinance which distinguished open parking places from closed garages for the purpose of taxation. *Philadelphia v. Samuels,* 338 Pa. 321, 12 A. 2d 79 (1940) ; see also *McGillick v. City of Pittsburgh,* 415 Pa. 581, 203 A. 2d 480 (1964) ; *Philadelphia v. Eglin's Garages, Inc.,* 342 Pa. 142, 19 A. 2d 845 (1941).

Commercial parking lots are without question a proper subject for local, municipal taxation. The City of Pittsburgh has decided, not without reason, that commercial parking operations should be singled out for special taxation to raise revenue because of traffic related problems engendered by these operations. This Court cannot say that placing such businesses in a separate taxable class is, ipso facto, an action so devoid of any reasonable basis as to constitute a violation of either the equal protection clause of the United States Constitution or the uniformity clause of the Pennsylvania Constitution.[4] ". . . [W]here the state seeks to raise revenue, it need not justify any distinction drawn

---

[4] In *Commonwealth v. Life Assurance Co. of Pa.,* 419 Pa. 370, 214 A. 2d 209 (1965), we held that the standards of the uniformity clause and of the equal protection clause are identical. The standard for uniformity under the Pennsylvania Constitution was further explicated in *F. J. Busse Co. v. Pittsburgh,* 443 Pa. 349, 279 A. 2d 14 (1971). There this Court said that the "test of uniformity is whether there is a reasonable distinction and difference between the classes of taxpayers sufficient to justify different tax treatment." Id. at 358, 279 A. 2d at 19. See *Amidon v. Kane,* 444 Pa. 38, 46-48, 279 A. 2d 53, 58-59 (1971).

between the taxed and nontaxed with respect to the raising of revenue so long as some other reasonable basis for treating the various classes differently exists. Where such distinction exists, the wisdom of the legislative policy of taxing one class and not another is not a matter for the courts. 'Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and an earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.' Chicago, Burlington & Quincy R. Co. v. McGuire, 219 U.S. 549, 569, 31 S. Ct. 259, 263 (1911)." *Commonwealth v. Life Assurance Co. of Pa.,* supra at 377-78 n.11, 214 A. 2d at 215 n.11.

## IV.

Appellants' second avenue of attack is that the Parking Tax Ordinance, coupled with direct economic competition by the Public Parking Authority, created with public funds (see *Price v. Philadelphia Parking Authority,* 422 Pa. 317, 335, 221 A. 2d 138, 148 (1966)), violates the due process clause of the Fourteenth Amendment of the United States Constitution. Specifically appellants maintain that the ordinance imposes a rate so excessive and unreasonable in light of the direct governmental competition, that it amounts to a confiscation of property without just compensation. Because of the alleged excessive and unreasonable rates, in these circumstances, appellants assert that the vast majority of parking lot owners and operators can no longer afford to remain in business. Additionally they argue that even those owners who are still not operating at a loss are not earning a reasonable return. This com-

plete inability to earn a reasonable return on investments is allegedly due to the combined effects of the 20 percent gross receipts tax and the competition from the Public Parking Authority, which charges lower rates. For example, the record establishes that the average all-day rate for the Public Parking Authority is about $2.00, while the average all-day rate for private operators is approximately $3.00.

In support of their contention appellants introduced at trial numerous statistical charts and compilations seeking to establish the unconstitutional impact of the gross receipts tax. A brief summary of this evidence shows the following.

After the imposition of the 20 percent gross receipts tax appellants' projected[5] figures for 1970 show that out of 14 different parking lot operators in downtown Pittsburgh nine would sustain operating losses. Of the five operators earning a profit only two would achieve a return of one percent or better. The highest return projected for any of the 14 operators in 1970 was 2.9 percent.

Moreover, the evidence produced by appellants indicates that as the gross receipts tax increases from the original 10 percent to the present 20 percent the percentage and number of parking lots unable to achieve any profit doubles. Again based on projections for 1970, when compelled to pay the 20 percent gross receipts tax, 65 percent of the individual lots would sustain operating losses. If the tax had remained at 15 percent, only 37 percent of the lots would fail to earn a profit. If the tax was reduced to its original 10 percent then only 30 percent of the lots would sustain losses.

---

[5] Appellants' statistics for 1970 are based on actual revenues obtained for the first six months of 1970, and projections for the later six months based on revenues for those same months during 1969.

The chancellor, upon evaluating the evidence presented, held that appellants had failed to meet their heavy burden of establishing the tax was confiscatory.[6] Therefore, the chancellor concluded the Parking Tax Ordinance was not confiscatory or a taking without due process.[7] He noted that even though "a few borderline operations may fall by the way" the tax is not necessarily confiscatory. The Commonwealth Court unanimously agreed that the tax was imposed at an unreasonable rate, but the majority concluded that although appellants as a group would sustain an operating loss under the unreasonably high tax, nevertheless "there is no constitutional prohibition of taxation at unreason-

---

[6] See *Amidon v. Kane*, 444 Pa. 38, 51, 279 A. 2d 53, 60 (1971); *F. J. Busse v. Pittsburgh*, 443 Pa. 349, 359, 279 A. 2d 14, 19 (1971); *Philadelphia v. Depuy*, 431 Pa. 276, 279, 244 A. 2d 741, 743 (1968).

[7] Among the factors weighed by the chancellor in reaching his determination that the tax rate was not confiscatory were the following:

1. Plaintiffs' statistics failed to include all parking lots in downtown Pittsburgh, serving to distort their financial projection.

2. Plaintiffs' projection failed to compute net profits.

3. The demand for parking spaces in Pittsburgh exceeds the supply.

4. None of the plaintiffs have increased their rates since February, 1970.

5. Plaintiffs have not attempted to pass on the increased tax to the parking lot patrons.

Moreover, the chancellor noted that plaintiffs failed to carry their heavy burden of proof that there was no reasonable basis for the tax. Specifically, the evidence revealed that gross receipts remained constant between 1969 and 1970 despite the tax increase; peripheral parking lots still operated at a profit; and plaintiffs' decreased rate of return was due at least in part to increased labor costs as well as increased tax liability.

Finally appellants contended that operating income less than ten percent of total revenues represented a confiscatory rate of taxation. The chancellor held that the court should not be asked to decide the question of what is a reasonable rate of return.

able or even confiscatory rates." *Alco Parking v. Pittsburgh,* 6 Pa. Commonwealth Ct. 433, 441, 291 A. 2d 556, 561, aff'd on rehearing, 6 Pa. Commonwealth Ct. 433, 295 A. 2d 349 (1972). Moreover, the Commonwealth Court also unanimously agreed, contrary to the chancellor's findings, that "appellants' [sic] are unable to pass the tax on to their customers, not only because customers cannot and will not pay higher rates but also *because the appellants are in competition with a public authority which, exempt from other taxes, can charge less."* Id. (Emphasis added).

Undoubtedly, if a tax is shown to be confiscatory it is utterly impermissible and a violation of the Constitution. See *A. Magnano Co. v. Hamilton,* 292 U.S. 40, 54 S. Ct. 599 (1934). This Court has been presented with similar allegedly excessive gross receipt taxes on parking lot operations on two prior occasions: *Philadelphia v. Eglin's Garages, Inc.,* 342 Pa. 142, 19 A. 2d 845 (1941); *Philadelphia v. Samuels,* 338 Pa. 321, 12 A. 2d 79 (1940). In both of those instances we held that the evidence presented by the parties attacking the taxing ordinance was insufficient to sustain a claim of confiscation without due process. However, neither case excluded the possibility that, upon a proper showing, a tax could be shown to be confiscatory. In *Samuels* and *Eglin* this Court indicated that two essential elements must exist before a tax can be held to be confiscatory. First, the taxpayer must show that more than "an occasional operator cannot afford to continue in business." *Samuels,* supra at 327, 12 A. 2d at 82. Secondly, he must show that the tax cannot be passed on to the consumer. *Eglin,* supra at 144, 19 A. 2d at 845; *Samuels,* supra.

Appellants, on this record, have shown that more than "an occasional operator cannot afford to continue in business". However, the chancellor found that appellants have made no significant attempt to pass the tax

on to the consumer. As noted previously the Commonwealth Court was of the unanimous opinion that the tax could not be passed on to the consumer because of the competition from the Public Parking Authority. Clearly if the private parking lot operators attempted to pass the full burden of the tax on to the consumers they would only succeed in increasing the disparity in the already disparate rates. For example, at the all-day rates shown in the record, if appellants were to attempt to pass the tax on to their patrons, their rates would increase from an average of $3.00 to $3.60, while a similar tax pass-on by the Public Parking Authority would increase their average rate from $2.00 to $2.40. Thus the differential in rates would increase from $1.00 to $1.20.

Even if appellants have not fulfilled the dual tests of *Samuels* and *Eglin,* nevertheless neither *Samuels* nor *Eglin* are completely applicable here, because neither case dealt with the precise issue involved in this case. *Samuels* and *Eglin* were disputes involving only one issue—whether a gross receipts tax, *by itself,* imposed a rate so unreasonable as to be confiscatory. The instant case, on the other hand, presents a significantly different and exceedingly more complex question. Here the allegedly excessive and unreasonable tax is combined with direct competition at lower rates from the Pittsburgh Parking Authority.

It is rare for courts to strike down tax legislation because the tax rate imposed is excessive. Very few, if any courts have been willing to void a tax *solely on the basis of an unreasonably high rate.* Thus, in *A. Magnano Co. v. Hamilton,* 292 U.S. 40, 47, 54 S. Ct. 599, 602 (1934), the Supreme Court emphasized that the question of whether a tax is so excessive that it will bring about the destruction of a business is *"a premise which, standing alone,* this court heretofore has uniformly rejected as furnishing no juridical ground for

striking down a taxing act." (Emphasis added). See *Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 562, 55 S. Ct. 525, 530 (1935) ; *Alaska Fish Salting & By-Products Co. v. Smith,* 255 U.S. 44, 48, 41 S. Ct. 219, 220 (1921). In this area courts have usually deferred to legislative bodies. See *Stewart Dry Goods Co. v. Lewis,* supra; *Fox v. Standard Oil of New Jersey,* 294 U.S. 87, 99, 55 S. Ct. 333, 338 (1935).

However, these same courts have acknowledged that in exceptional circumstances the taxing power of the Legislature may be abused, and, if so, it would violate both the Fifth and Fourteenth Amendments. In *A. Magnano Co. v. Hamilton,* supra, although upholding the constitutionality of a tax on all butter substitutes, the Supreme Court stated: "Except in rare and special instances, the due process of law clause contained in the Fifth Amendment is not a limitation upon the taxing power conferred upon Congress by the Constitution. Brushaber v. Union Pac. R. R., 240 U.S. 1, 24, 36 S. Ct. 236, 60 L. Ed. 493. And no reason exists for applying a different rule against a state in the case of the Fourteenth Amendment. . . . That clause is applicable to a taxing statute such as the one here assailed *only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property.* . . . Nor may a tax within the lawful power of a state be judicially stricken down under the due process clause simply because its enforcement may or will result in restricting or even destroying particular occupations or businesses . . . unless, indeed, as already indicated, its necessary interpretation and effect be such as plainly to demonstrate that the form of taxation was adopted as a mere disguise, under which there was exercised, in reality, another and different power denied by the Federal Constitution

to the state." *Id.* at 44, 54 S. Ct. at 601 (emphasis added) (citations omitted). See *Fox v. Standard Oil Co. of New Jersey,* supra at 100, 55 S. Ct. at 338; *Heiner v. Donnan,* 285 U.S. 312, 326, 52 S. Ct. 358, 361 (1932); *Nichols v. Coolidge,* 274 U.S. 531, 541, 47 S. Ct. 710, 713 (1927); *McCray v. United States,* 195 U.S. 27, 63, 24 S. Ct. 769, 779 (1904).[8]

Moreover, when determining the validity of a tax courts must evaluate the nature and effect of that tax, not merely its name or description. "The substance and not the shadow determines the validity of the exercise of the [taxing] power." *Stewart Dry Goods Co. v. Lewis,* supra at 555, 55 S. Ct. at 527. See *Senior v. Braden,* 295 U.S. 422, 429, 55 S. Ct. 800, 802 (1935).

This Court has heretofore not had occasion to hold a tax to be so excessive and unreasonable as to compel the conclusion that it was not the proper exertion of taxation, but a confiscation of property. However, this Court has not previously had presented to it a controversy where the taxing body was in direct competition, as here, with private enterprise and simultaneously imposed a burdensome gross receipts tax on all competi-

---

[8] In *McCray v. United States,* 195 U.S. 27, 63, 24 S. Ct. 769, 779 (1904), the Supreme Court admonished that if a legislative power such as the taxing power were abused so as to destroy fundamental rights which no free government could consistently violate, it would be the duty of the judiciary to hold such acts to be void upon the assumption that the Constitution forbade them. "Let us concede that if a case was presented where the abuse of the taxing power was so extreme as to be beyond the principles which we have previously stated, and where it was plain to the judicial mind that the power had been called into play, not for revenue, but solely for the purpose of destroying rights which could not be rightfully destroyed consistently with the principles of freedom and justice upon which the Constitution rests, that it would be the duty of the courts to say that such an arbitrary act was not merely an abuse of a delegated power, but was the exercise of an authority not conferred." *Id.* at 64, 24 S. Ct. at 780.

tors in that activity (including itself).[9] This is undeniably a "rare and special instance"[10] where the due process clause imposes strict constraints upon the exercise of the legislative taxing power.

As appellants emphasize it is doubtful that the state Legislature ever intended the public parking authorities utilizing public financing advantages, to compete directly with private parking operators in this fashion. In fact, the declaration of policy in the Parking Authority Law of 1947[11] specifically provides: ". . . That it is intended that the authority cooperate with all existing parking facilities so that private enterprise and government may mutually provide adequate parking services for the convenience of the public;" Act of June 5, 1947, P. L. 458, §2, as amended, 53 P.S. §342. Nonetheless, Pittsburgh parking operators are now not only denied the cooperation intended in the statute, but are actually confronted with direct, adverse competition from the Public Parking Authority.

---

[9] As of this writing, the Allegheny County Court of Common Pleas has ruled that the Public Parking Authority is exempt from payment of the challenged gross receipts tax. *Public Parking Authority of Pittsburgh v. City of Pittsburgh*, No. 687, July Term, 1972. See *Allegheny County v. Moon Township*, 436 Pa. 54, 258 A. 2d 630 (1969). An appeal is presently pending before the Commonwealth Court.

However, whether the Public Parking Authority is subject to the tax seems to make little real difference in the context of this present dispute. Even if the Authority had to pay the tax to the City it would mean only in reality an accounting transaction, transferring dollars from one pocket of an instrumentality of City government to another. Thus although appellants' argument would be strengthened by the common pleas court's decision, we need not presently rest our decision upon *Public Parking Authority of Pittsburgh v. City of Pittsburgh*, supra.

[10] *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 44, 54 S. Ct. 599, 601 (1934).

[11] Parking Authority Law, Act of June 5, 1947, P. L. 458, §§1 et seq., as amended, 53 P.S. §§341 et seq.

Furthermore, the Public Parking Authority is blessed with certain other legislatively bestowed advantages and able, therefore, to charge lower rates. The Parking Authority is exempt from payment of all real estate taxes because of the exclusion given to public property used for public purposes.[12] Because lower interest rates are granted to municipal corporations seeking to borrow money, the Parking Authority is able to arrange cheaper and longer term financing. This also reduces significantly the rates charged by the Authority, and increases in intensity the degree and nature of its direct competition with the private parking lot operators. It is certainly undeniable that the Parking Authority is able to finance its site and construction costs through the attractive medium of long term, lower interest public financing, with all the benefits which attend such governmental arrangements, not available to private businessmen. See *Price v. Philadelphia Parking Authority*, 422 Pa. 317, 355, 221 A. 2d 138, 148 (1966). It is the combination of these factors which creates the extraordinary competitive advantage which the Public Parking Authority is able to exert over the non-governmental parking lot owners and operators.

Not only is the Parking Authority able to charge lower rates than private operators, but with the enactment of the 20 percent gross receipts tax the taxing body now appropriates for itself practically all of the earnings of the private parking lot operators. By taking 20 percent of gross revenues "off the top" the City effectively confiscates what were formerly the earnings of the parking lot owners. This confiscation is practically as complete as if the Ctiy had condemned without compensation the private lots to erect public facilities.[13]

---

[12] See generally *Allegheny County v. Moon Township*, 436 Pa. 54, 258 A. 2d 630 (1969).

[13] It is noted that while this appeal was pending before this Court the City of Pittsburgh enacted a Parking Tax Ordinance

In this situation it is unnecessary for private lot operators to prove that they cannot pass the tax on to their customers (although as previously noted the Commonwealth Court found this was not possible). See *Samuels*, supra; *Eglin*, supra. Clearly by raising their rates the private operators would greatly increase the already significant rate differential between private and public parking lots. The public competition thus effectively prohibits private lot operators from increasing their rates and passing the tax on to their patrons, while the imposed tax appropriates whatever earnings were formerly produced. Where such an unfair competitive advantage accrues, generated by the use of public funds, to a local government at the expense of private property owners, without just compensation, a clear constitutional violation has occurred.[14]

---

superseding the present, challenged Ordinance. The new Ordinance was scheduled to take effect April 1, 1973. This new Ordinance provides for the imposition "of a tax of 20 percentum (20%) upon the consideration *paid by the patrons of a non-residential parking place for each parking transaction, to be collected from the patron by the operator* of each such non-residential parking place; . . ." Ordinance No. 30, January 26, 1973 (emphasis added).

[14] See Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964). Professor Sax has suggested a test for determining when just compensation is due private property owners as a result of governmental activity. In Professor Sax's view government interacts with the private sector in two ways. First, government "governs," i.e., "it mediates the disputes of various citizens and groups within the society" and "resolves the conflict among competing and conflicting alternatives." Id. at 62. Secondly, government acts in an enterprise capacity in which it acquires economic resources for its own account and thereby competes with private industry. Id.

Professor Sax states that: ". . . when economic loss is incurred as a result of government enhancement of its resource position in its enterprise capacity, then compensation is constitutionally required; it is that result which is to be characterized as a taking. But losses, however severe, incurred as a consequence of government acting merely in its arbitral capacity are to be viewed as a non-compensable exercise of the police power." Id. at 63.

This is admittedly a case of first impression in this Commonwealth. Traditionally governmental activities

More specifically he adds: ". . . when an individual or limited group in society sustains a detriment to legally acquired existing economic values as a consequence of government activity which enhances the economic value of some governmental enterprise, then the act is a taking, and compensation is constitutionally required; but when the challenged act is an improvement of the public condition through resolution of conflict within the private sector of the society, compensation is not constitutionally required.

"To be sure, the acquisition of title or the taking of physical possession will be present in the great majority of taking cases under this theory. But—and this is the important point—the presence or absence of a formal title-acquisition and/or invasion will never be conclusive. These formalities are not necessarily present when the government, as an enterpriser, is acquiring resources for its own account." Id. at 67.

Such an approach is indeed logical, and facilitates our analysis here. Clearly the City of Pittsburgh is acting in an enterprise capacity by operating a publicly financed parking lot which competes with private industry. To the extent that the Public Parking Authority has gained an unfair competitive edge over private parking lot owners through tax exemptions and lower rates, and more importantly appropriated an unreasonable proportion of their revenues via the gross receipts tax, a taking requiring just compensation has occurred. In the absence of any compensation a taking without due process of law results.

Applying a similar rationale in *Hasegawa v. Maui Pineapple Co.*, 52 Haw. 327, 475 P. 2d 679 (1970), the Supreme Court of Hawaii invalidated a statute requiring private employers to pay their employees any wages they may have lost as a result of service on a jury or a public board or commission. The Court there stated: "In enacting HRS §388-32 the legislature attempted to shift to private employers some of the cost of running the public enterprises of juries and public boards and commissions. In this case money, instead of realty, is being taken for a public use. However, we see no difference between the taking of money to pay public employees and the taking of realty to house government institutions. *In both instances, the State is seeking to enhance the economic value of a government enterprise at the direct expense of a particular individual or group. This is precisely the kind of government 'taking' which requires just compensation.*" Id. at 334, 475 P. 2d at 684 (footnote omitted) (emphasis added).

held to be unconstitutional takings of property without due process of law are restricted, for example, to the realm of zoning and eminent domain. However, no reason has been suggested why unconstitutional takings must necessarily be restricted only to this segment of the law. Indeed, this Court has held that "a 'taking' is not limited to an actual physical possession or seizure of the property; if the *effect* of the zoning law or regulation is to deprive a property owner of the lawful use of his property it amounts to a 'taking', for which he must be justly compensated:" *Cleaver v. Board of Adjustment,* 414 Pa. 367, 372, 200 A. 2d 408, 412 (1964) and cases cited therein.

Moreover, in determining what is a taking this Court may not allow form to prevail over substance. As the Supreme Court noted, "The substance and not the shadow determines the validity of the exercise of the power." *Stewart Dry Goods Co. v. Lewis,* supra at 555, 55 S. Ct. at 527. Clearly "whether the government takes title or possession of the subject property is merely a matter of the form in which it chooses to proceed." Sax, Takings and the Police Power, 74 Yale L.J. 36, 46 (1964). Here the City has appropriated most, if not all, the earnings of the private parking lot owners through the imposition of an excessive gross receipts tax. It has also enhanced the detriment to private property owners by creating its own publicly subsidized competition. This governmental enterprise competing with private industry adds not only a new and most significant dimension to the traditional constitutional problem of what constitutes a taking without due process but also an impermissible one.

It must be concluded that the unreasonably burdensome 20 percent gross receipts tax, causing the majority of private parking lot operators to operate their businesses at a loss, in the special competitive circumstances of this case, constitutes an unconstitutional taking of

private property without due process of law in violation of the Fourteenth Amendment of the United States Constitution.

The order of the Commonwealth Court and the decree of the Allegheny County Court of Common Pleas are reversed and remanded to the Allegheny County Court of Common Pleas for proceedings consistent with this opinion to determine the nature and extent of the refund to which appellants may be entitled.

Each party to pay own costs.

Mr. Justice O'Brien concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE EAGEN:

I emphatically dissent!

It is not and may not be questioned that the City of Pittsburgh has the power to tax a parking transaction for revenue purposes under the Local Tax Enabling Act, Act of December 31, 1965, P. L. 1257, 53 P.S. §6902. See also, *University Club v. Pittsburgh*, 440 Pa. 562, 271 A. 2d 221 (1970). However, the majority rule that this particular tax on parking transactions imposed by the City of Pittsburgh is confiscatory, and, hence, amounts to an unconstitutional taking of private property without due process of law. Neither the *facts in the record* or the pertinent case law support this conclusion. In fact, every case cited by the majority in support of its conclusion reaches the opposite result.

Thirty-three years ago in *Philadelphia v. Samuels*, 338 Pa. 321, 12 A. 2d 79 (1940), this Court held that before a tax may be ruled confiscatory the challenging taxpayer must establish two facts: (1) that the tax is forcing a substantial, as distinguished from an occasional businessman out of business; and (2) the challeged tax cannot be passed on to the consumer. To the same effect, see *Philadelphia v. Elgin's Garages, Inc.*, 342 Pa.

142, 19 A. 2d 845 (1941). Even a casual reading of the instant record discloses the complaining-plaintiffs have failed to establish either one of these facts. Moreover, the trial court whose findings of fact have the force and effect of a jury's verdict and which, incidentally, the majority opinion ignores, specifically found on ample evidence in the record: (1) the demand for parking space in the City of Pittsburgh far exceeds the supply; (2) none of the plaintiffs have increased their rates because of the tax involved; (3) the plaintiffs have not attempted to pass on the increased tax to their parking patrons; and (4) when the City's Parking Authority recently raised its rates, it experienced only a temporary reduction in the number of cars seeking use of its parking facilities. Furthermore, after reviewing the evidence the trial court concluded that the complaining-plaintiffs are continuing to make a profit from their operations, though it may not be as great a margin as desired, and if any privately-owned parking operators are forced out of business it will be only a few borderline cases. It is obvious, therefore, that the majority opinion fails to comport with our rulings in *Philadelphia v. Samuels*, supra, and *Philadelphia v. Elgin's Garages, Inc.*, supra.

Focusing now on the decisions of the Supreme Court of the United States, it can be stated as a general principle that under normal circumstances the power to tax is unlimited[1] and the due process clause of the Fifth

---

[1] Early in the history of the Supreme Court of the United States, Mr. Chief Justice MARSHALL in *McCulloch v. Maryland*, 4 Wheat 316, 4 L. Ed. 579 (1819), stated the following with respect to the unlimited nature of the taxing power:

"[T]he power of taxing people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the

and Fourteenth Amendments is not a limitation upon the taxing power of the legislative branch of the government.[2]

government itself. In imposing a tax, the legislature acts upon its constituents. This is, in general a sufficient security against erroneous and oppressive taxation.

"The people of a state, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against its abuse." Id. at 428, 4 L. Ed. at 607.

In *Knowlton v. Moore*, 178 U.S. 41, 20 S. Ct. 747 (1900), the Supreme Court of the United States recognized the inherent difficulty in placing a limitation on the lawful exercise of the taxing power: "In other words, the power to destroy which may be the consequence of taxation is a reason why the right to tax should be confined to subjects which may be lawfully embraced therein, even although it happens that in some particular instance no great harm may be caused by the exercise of the taxing authority as to a subject which is beyond its scope. But this reasoning has no application to a lawful tax, for if it had there would be an end of all taxation; that is to say if a lawful tax can be defeated because the power which is manifested by its imposition may when further exercised be destructive, it would follow that every lawful tax would become unlawful, and therefore no taxation could be levied." Id. at 60, 20 S. Ct. at 755.

[2] In *Brushaber v. Union Pacific R. R.*, 240 U.S. 1, 36 S. Ct. 236 (1916), the Supreme Court noted the due process clause is not a limitation on the lawful exercise of the taxing power stating: "So far as the due process clause of the Fifth Amendment is relied upon, it suffices to say that there is no basis for such reliance since it is equally well settled that such clause is not a limitation upon the taxing power conferred upon congress by the Constitution; in other words, that the Constitution does not conflict with itself by conferring upon the one hand a taxing power and taking the same power away on the other by the limitations of the due process clause. Treat v. White, 181 U.S. 264; Patton v. Brady, 184 U.S. 608; McCray v. United States, 195 U.S. 27, 61; Flint v. Stone Tracy Co., supra; Billings v. United States, 232 U.S. 261, 282." Id. at 24, 36 S. Ct. at 244.

In *Magnano Co. v. Hamilton*, 292 U.S. 40, 54 S. Ct. 599 (1934), the Supreme Court explained under what circumstances the due process clause limits a taxing statute: "Except in rare and special instances, the due process of law clause contained in the Fifth Amendment is not a limitation upon the taxing power conferred upon Congress by the Constitution. . . . And no reason exists for applying a different rule against a state in the case of the Fourteenth Amendment. . . . That clause is applicable to a taxing statute such as the one here assailed only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property. . . . Collateral purposes or motives of a Legislature in levying a tax of a kind within the reach of its lawful power are matters beyond the scope of judicial inquiry. . . . Nor may a tax within the lawful power of a state be judicially stricken down under the due process clause simply because its enforcement may or will result in restricting or even destroying particular occupations or businesses . . . unless, indeed, as already indicated, its necessary interpretation and effect be such as plainly to demonstrate that the form of taxation was adopted as a mere disguise, under which there was exercised, in reality, another and different power denied by the Federal Constitution to the state." Id. at 44-45, 54 S. Ct. at 601-02. Thus, the due process clause only affects the validity of a taxing statute where it can be ascertained the statute is "arbitrary", and not an exercise of the taxing power, but a "disguise" for the exertion of a different and unlawful power. The majority opinion does not indicate this taxing statute qua taxing statute is invalid, or the taxing measure "does not involve an exertion of the taxing power", which are the guidelines established by the Supreme Court of the

United States. Rather, the majority opinion focuses on the tax rate and its enforcement, and I view this as error. It is one thing to say a taxing statute is arbitrary and beyond the reach of the taxing power of the legislative branch, a point I do not contest, but it is quite another to say the exercise of the lawful taxing power is a violation of due process of law because of a high tax rate.

The Supreme Court of the United States has considered the issue of high tax rates in numerous instances, and in each case the Court refused to strike down the levy because of the high rate structure. In *Stewart Dry Goods Co. v. Lewis*, 294 U.S. 550, 55 S. Ct. 525 (1935), the Court reviewed a gross sales tax on merchants. Speaking specifically of the extent of the burden of a tax, the Court stated:

"Every taxing law must pass the constitutional test applied by the courts to the method of imposition, but the measure of the impost rests in the discretion of the Legislature.

"To condemn a levy on the sole ground that it is excessive would be to usurp a power vested not in the courts but in the Legislature and to exercise the usurped power arbitrarily by substituting our conceptions of public policy for those of the legislative body." Id. at 562, 55 S. Ct. at 530. Thus, in *Stewart*, the Court expressly stated the "measure of the impost" is not for the courts to consider. In *Veazie Bank v. Fenno*, 8 Wall. 533 (1869), again the Court reflected on the issue of high rates, stating: "It is insisted, however, that the tax in the case before us is excessive, and so excessive as to indicate a purpose on the part of Congress to destroy the franchise of the bank, and is, therefore, beyond the constitutional power of Congress.

"The first answer to this is that the judicial cannot prescribe to the legislative departments of the government limitations upon the exercise of its acknowledged

powers. The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. So if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot, for that reason only, be pronounced contrary to the Constitution." Id. at 548. See also *Alaska Fish Salting & By-Products Co. v. Smith*, 255 U.S. 44, 41 S. Ct. 219 (1921). Notwithstanding these pronouncements, the Majority opinion hinges its decision on consideration of the tax rate and enforcement or more precisely, the "result" of the exertion of the lawful taxing power, an approach the Supreme Court of the United States has consistently stated to be erroneous.[3]

If one focuses exclusively on the result by reviewing the tax rate and its impact, it is conceivable that every tax could be considered confiscatory. The true essence

---

[3] In *Magnano*, the Court stated: "The point may be conceded that the tax is so excessive that it may or will result in destroying the intrastate business of appellant; but that is precisely the point which was made in the attack upon the validity of the 10 percent tax imposed upon the notes of state banks involved in Veazie Bank v. Fenno, 8 Wall. 533, 548, 19 L. Ed. 482. This court there disposed of it by saying that the courts are without authority to prescribe limitations upon the exercise of the acknowledged powers of the legislative departments. 'The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected.' Again, in the McCray Case, supra, answering a like contention, this court said (page 50 of 195 U.S., 24 S. Ct. 769, 778) that the argument rested upon the proposition 'that, although the tax be within the power, as enforcing it will destroy or restrict the manufacture of artificially colored oleomargarine, therefore the power to levy the tax did not obtain. This, however, is but to say that the question of power depends, not upon authority conferred by the Constitution, but upon what may be the consequence arising from the exercise of the lawful authority.' And it was held that if a tax be within the lawful power of the Legislature, the exertion of the power may not be restrained because of the results to arise from its exercise." 292 U.S. at 45, 54 S. Ct. at 602.

of the plaintiffs' claim is the tax rate is so high they are barred from making the profit margin they would desire. Given this fact, and accepting the majority's rationale, it follows that a marginal business with a small profit margin could make the same claim appellants herein assert about a 5% excise tax. In this regard, the *Magnano* Court stated: "If the tax imposed had been 5 cents instead of 15 cents per pound, no one, probably, would have thought of challenging its constitutionality or of suggesting that under the guise of imposing a tax another and different power had in fact been exercised. If a contrary conclusion were reached in the present case, it could rest upon nothing more than the single premise that the amount of the tax is so excessive that it will bring about the destruction of appellant's business, a premise which, standing alone, this court heretofore has uniformly rejected as furnishing no juridical ground for striking down a taxing act." 292 U.S. at 47, 54 S. Ct. at 602.

The most troublesome aspect of the rationale adopted by the majority opinion is that by considering the tax rate, it is taking on a non-judicial function, and in effect sitting as a legislative body. This approach strikes at the heart of the principle of separation of powers and is, therefore, contrary to constitutional doctrine. The sum and substance of the majority's opinion is: the tax rate is too high for the garage owners to make a substantial profit; hence, the tax is unjust and must be struck down. However, the wisdom of a tax rate is strictly for the legislative branch, and for this Court to strike a tax down because of a high rate is to usurp a legislative power. Moreover, by so doing this Court has to go beyond its power and exercise the usurped power in an arbitrary fashion by substituting its concept of public policy, or wisdom, for that of the Legislature. See *Stewart Dry Goods Co. v. Lewis,* supra.

In *McCray v. United States,* 195 U.S. 27, 24 S. Ct. 769 (1904), the Supreme Court stated:

"Whilst, as a result of our written constitution, it is axiomatic that the judicial department of the government is charged with the solemn duty of enforcing the Constitution, and therefore in cases properly presented, of determining whether a given manifestation of authority has exceeded the power conferred by that instrument, no instance is afforded from the foundation of the government where an act, which was within a power conferred, was declared to be repugnant to the Constitution, because it appeared to the judicial mind that the particular exertion of constitutional power was either unwise or unjust. To announce such a principle would amount to declaring that in our constitutional system the judiciary was not only charged with the duty of upholding the Constitution but also with the responsibility of correcting every possible abuse arising from the exercise by the other departments of their conceded authority. So to hold would be to overthrow the entire distinction between the legislative, judicial and executive departments of the government, upon which our system is founded, and would be a mere act of judicial usurpation.

"It is, however, argued if a lawful power may be exerted for an unlawful purpose, and thus by abusing the power it may be made to accomplish a result not intended by the Constitution, all limitations of power must disappear, and the grave function lodged in the judiciary, to confine all the departments within the authority conferred by the Constitution, will be of no avail. This, when reduced to its last analysis, comes to this, that, because a particular department of the government may exert its lawful powers with the object or motive of reaching an end not justified, therefore it becomes the duty of the judiciary to restrain the exercise of a lawful power wherever it seems to the judicial mind that such lawful power has been abused. But this reduces itself to the contention that, under our con-

stitutional system, the abuse by one department of the government of its lawful powers is to be corrected by the abuse of its powers by another department." Id. at 53-54, 24 S. Ct. at 775-76. It is not within this Court's power or function to make legislative decisions, such as the wisdom of a particular tax rate. "Once the lawfulness of the method of levying the tax is affirmed, the judicial function ceases. He deludes himself by false hope who supposes that, if this court shall at some future time conclude the burden of exaction has become inordinately oppressive, it can interdict the tax." *Stewart Dry Goods Co. v. Lewis, supra,* 294 U.S. at 563, 55 S. Ct. 530.

The majority, however, would have us believe the rulings of the Supreme Court of the United States are not applicable to the instant case because of the element of competition. In my view, the argument that the combination of a high tax rate and government competition invalidates a taxing measure is spurious for the dual reason that the tax rate is not for us to consider, and the element of competition is basically irrelevant. Our concern is with the lawfulness of the method of levying the tax, not with these two elements. The majority apparently believes these two elements bring the tax within the *Magnano* rule that a tax will be considered unlawful when "its necessary interpretation and effect be such as plainly to demonstrate that the form of taxation was adopted as a mere disguise, under which there was exercised, in reality, another and different power." But there is not one shred of evidence in the record that this is anything but a pure taxing measure for revenue purposes. There is not any evidence in the record that this measure is a "disguise". Competition is clearly beyond the scope of this case, since our inquiry is limited to the lawfulness of the "form of taxation."[4]

---

[4] The question is raised by the majority's approach that if the government unit was in the public transportation field, would this

The majority views government competition as a new element in this area of the law, an element never presented in a factual situation to a court before. However, in the *Veazie Bank Case*, the Supreme Court of the United States was faced with a comparable situation since the federal government was therein directly competing with the state banks in issuing currency.[5] A 10% tax was imposed on the notes of state banks and the effect was to put the national banks at a competitive advantage by driving the state banks out of existence. The Court never once discussed the element of competition and stated: "The power to tax may be exercised oppressively upon persons, but the responsibility of the legislature is not to the courts, but to the people by whom its members are elected. *So if a particular tax bears heavily upon a corporation, or a class of corporations, it cannot, for that reason only, be pronounced contrary to the Constitution.*" 8 Wall., supra at 548. Thus, I do not view the element of competition as adding anything new or different to this area of the law, or as relevant to the consideration of the lawfulness of a taxing form.

Mr. Chief Justice JONES joins in this dissenting opinion.

---

dictate a like result. Under this example, the government would be "competing" with the parking lot owners, although the competition would be more indirect. Examples such as this show how far removed from the proper judicial function the majority will lead us. Moreover, the majority somehow suggests this tax puts the City at a competitive advantage; however, it is not this tax but the exemptions the City has from other taxes which puts the City in a better position than the private operators. Thus, it would appear under the majority approach not only this tax, and competition, but all taxes which affect the City, must be considered.

[5] It can be argued part of the foundation of this case rests on the power of the federal government to provide currency, however, it is equally clear the case holds excessive tax rates alone will not invalidate a taxing measure.

DISSENTING OPINION BY MR. JUSTICE POMEROY:

I concur in the dissenting opinion of Mr. Justice EAGEN, but believe it desirable to augment that opinion by several additional observations.

## I.

I consider it unfortunate that the Court, in its footnote 2, prematurely and unnecessarily undertakes to decide the relative authority of our decisions in *Rochester & Pittsburgh Coal Co. v. Indiana County Board of Assessment*, 438 Pa. 506, 266 A. 2d 78 (1970), and *Lynch v. Owen J. Roberts School District*, 430 Pa. 461, 244 A. 2d 1 (1968). These cases are concerned with equity jurisdiction in constitutionally-based challenges to taxing statutes where the challenge can be adjudicated in a statutorily prescribed appeal procedure. That question is only obliquely involved in this case in connection with the applicability of the procedure allowed by section 6 of the enabling statute[1] whereby the taxpayer can secure a judicial determination of the reasonableness of a local tax. There was no attempt by the taxpayers to avail themselves of the section 6 determination of "reasonableness"; neither was there any objection by the City at the trial level or on appeal in the Commonwealth Court to the exercise of equitable jurisdiction because the enabling act procedure had not been pursued. Thus the discussion in the Commonwealth Court opinion as to what a court might have done (i.e., find the tax rate "unreasonable") had a

---

[1] The "Tax Anything Act," December 31, 1965, P.L. 1257, as amended, 53 P.S. §6906. That section permits taxpayers aggrieved by a local tax measure to challenge its validity within a thirty (30) day period following enactment. The court shall then, if it concludes that the ordinance is unlawful or finds that the tax imposed is "excessive or unreasonable", declare the ordinance invalid or reduce the rate of the tax.

section 6 challenge been made was beside the point; the decision holds the tax valid on constitutional grounds. The same is true of this Court's opinion, since the decision goes off on constitutional grounds, albeit with the opposite result. All that the City *is doing* (part IV of its brief in this Court) is to argue that since the parties agree that the case raises issues solely of a constitutional nature, the "reasonableness" of the parking tax cannot be raised on this appeal. In any event, it argues, a section 6 attack must be timely made, and in the trial court. In addition it cannot gain consideration in this suit by being "appended" to the constitutional issue—even a substantial one, which the City contends this one is not.

This Court has only recently granted allocatur in a case squarely presenting the jurisdictional problem involved in *Lynch* and *Rochester, supra. Borough of Greentree v. The Board of Property Assessment of Allegheny County,* Nos. 141 and 142, March Term, 1973 (Allocatur granted on April 11, 1973). Our ultimate decision in that case should not be prejudiced by needless dicta in this one.

## II.

On the constitutional question, the Court today holds that the parking tax ordinance of the City of Pittsburgh is a taking of "private property . . . for public use without just compensation" in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States, relying, *inter alia,* on dictum found in *Philadelphia v. Samuels,* 338 Pa. 321, 12 A. 2d 79 (1940). On this record I cannot agree.[2]

---

[2] I do agree, however, that the tax is not imposed in violation of the uniformity requirement of the Constitution of Pennsylvania, Art. VIII, §1.

I can conceive that a tax could be confiscatory (and I do not understand Justice EAGEN to be of a different view). For example, were the ordinance one imposing a tax of 100% on the *net income* of the appellants' enterprises, thus making it impossible beyond any doubt to operate at a profit, I am inclined to think that this would be a taking of private property for which compensation would be required. The tax here, of course, is on gross proceeds, not net income, and at the admittedly high rate of 20%. This tax *could*, however, be the practical equivalent of a 100% tax on net income if the operating expenses of the taxed enterprises absorb the other 80% of gross receipts. But this complete elimination of profitability would, of course, have to be supported by the experience of the industry.

It is at this point that the Court and I part company, for I believe that little attention has been paid to the facts of the case and the economic theories necessarily involved.[3] There are two factual issues: (a) current, substantial unprofitability of the taxed enterprises, and (b) lack of market power to shift the inci-

---

[3] I also disagree with the majority's reliance (see opinion of the Court, ante at 267 n.14) on the constitutional theories of Professor Sax, see Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964), and on the "similar rationale" of the Supreme Court of Hawaii in *Hasegawa v. Maui Pineapple Co.*, 52 Haw. 327, 475 P. 2d 679 (1970).

In *DayBrite Lighting, Inc. v. Missouri*, 342 U.S. 421, 96 L. Ed. 469 (1952), the Supreme Court of the United States sustained against constitutional attack a Missouri statute which makes it a misdemeanor to deduct wages of an employee when the employee absents himself to vote. The Supreme Court has now unanimously reiterated that view in *Dean v. Gadsden Times Publishing Co.*, 412 U.S. 543, 37 L. Ed. 2d 137, 41 U.S.L.W. 3643 (1973) (Per Curiam: an Alabama statute providing that an employee excused for jury duty "shall be entitled to his usual compensation received from such employment less the fee or compensation he received for serving as a juror" is on "no less sturdy a [constitutional] footing" than the statute upheld in *DayBright Lighting*).

dence of the tax to the parking consumer. Like the chancellor below[4]—to whose findings the Court pays scant heed[5]—I am not satisfied with appellants' evidentiary showings on either point.

(a) *Current, Substantial Unprofitability.*

Ordinance No. 704 of the City of Pittsburgh, imposing a 20% tax on the gross proceeds of commercial parking transactions, was enacted on December 31, 1969 and became effective on February 1, 1970. It superseded a predecessor parking tax (Ordinance No. 675) which was enacted in 1968 and which imposed a similar tax of 15%. We are told, though not part of the record made below, that Ordinance No. 704 in turn has been superseded by Ordinance No. 30 of January 26, 1973 which became effective on April 1, 1973. There is, therefore, a period of a little more than three years during which appellants' businesses were subject to and in fact paid the disputed tax. The present lawsuit, however, was filed on February 20, 1970, very soon (nineteen days) after the tax became effective, and the trial of the case took place on September 15, 16, and 17, 1970. The

---

[4] The chancellor found that:

"19. The demand for parking spaces in the City of Pittsburgh far exceeds the supply.

"20. None of the plaintiffs have [sic] increased their [sic] rates since February of 1970.

"21. Plaintiffs have not attempted to pass on the increased tax to the parking lot patrons."

[5] As the majority opinion indicates, the Commonwealth Court reversed the chancellor's finding, and observed that: "The appellants are unable to pass the tax on to their customers, not only because customers cannot and will not pay higher rates but also because the appellants are in competition with a public authority which, exempt from other taxes, can charge less." While I see no basis for reversing the chancellor's findings of fact, it is to be noted that the Commonwealth Court *affirmed* the chancellor's conclusions of law. Thus that court could as easily have said that "even on appellants' version of the facts, affirmance would be in order."

economic evidence there introduced was, as the Court's opinion indicates, *"projected* figures for 1970" based on industry experience under the challenged tax from February 1, 1970 through May 31, 1970. While there is nothing inherently inadmissible about economic projections, properly constructed and qualified,[6] I think that they become inherently inadequate when actual economic data are in fact available for the period of the projection. We do not adequately discharge our duty of invalidating taxing acts, see *Commonwealth v. Life Assurance Co. of Pennsylvania,* 419 Pa. 370, 377, 214 A. 2d 209 (1965), as "clearly, palpably and plainly" unconstitutional when we so hold on the basis of five months' experience under the statute as contrasted with the now available three years' experience. The appellants have prevailed in no court save this one and hence have throughout that period been subject to the 20% tax. I cannot see that a remand for development of the record in light of *actual industry experience* would prejudice the interests of any party to these proceedings, public or private. Certainly the people of the City of Pittsburgh are entitled to as much before losing the millions of dollars in tax revenues here involved.

(b) *Lack of Market Power To Shift the Incidence of the Tax.*

Appellants' showing of a lack of ability to pass the tax on to the consumer is most unpersuasive. It con-

---

[6] The plaintiff-appellants' witness who assembled the economic data supplied to him by appellants was by education an electrical engineer. He had at one time taken one 6 months course in statistics, but none in accounting. The data introduced did not purport to be a complete presentation of the operations of appellants' business entities. In addition, there was no showing of what fraction of the operating expenses represented salary attributed to the owners of the various enterprises involved here, or what portion of such payments to owners could fairly be said to represent return on investment.

sisted of two kinds of evidence: first, assertions on behalf of the appellant-enterprises that they were charging all the traffic would bear at the time of enactment of the 20% tax, i.e., prices which maximized their gross proceeds,[7] and second, testimony of the manager of Meyers Bros. Parking-Central Corporation, the operator of the parking garage in Chatham Center, that when that corporation raised its prices in 1968 in response to the enactment of the 1968 ordinance of 15%, the business of that garage had actually diminished.

As to the first, I do not think it follows from the fact that all private entrepreneurs strive to maximize profits that all prices set by them are at profit-maximizing levels. The bare assertion by an appellant that "[if] I could raise the rates to meet this tax . . ., I would have . . ." falls far short of the quality of proof required to show the tax clearly, palpably and plainly unconstitutional.

The second line of proof is similarly inadequate. At issue here is the market power of the *taxed industry* to shift the incidence of the tax to the consumer. What occurred in 1968 when *one member* of that industry

---

[7] A representative sample of such testimony follows: "Q. . . . Is it feasible for you to raise your rates now to meet this tax? A. I cannot raise the rates now. If I could raise the rates to meet this tax that's been in effect since February, I would have. I do not feel that I would accomplish anything but drive my customers away if I raise my rates at this time.

. . .

"A. . . . I have a feeling for this business. . . . There is only so much money you can charge.

. . .

"Q. So . . . [W]hat is your opinion as to whether this parking tax can be passed on? A. The parking tax can never be passed on. That is silly. You are charging the rate that you think is the best one for you right at that time. If you raise that rate, you either drive customers away or you change the character of the business." Record at 19, 20.

raised its rates is hardly probative of what would occur if the *industry*, in response to enactment of a tax ordinance at a higher rate, were to raise rates.[8]

Not only do I conclude that appellants failed in their proof of inability to shift the tax burden such as to invalidate the tax, but I find ample evidence of the existence of such market power. First, there is the fact, revealed by the testimony of appellants' witnesses, that appellants have posted general rate increases at intervals in the 1960s and have always experienced an increase in gross receipts. Second is the fact—a matter of common knowledge in Pittsburgh of which I think the Court can take judicial notice—that the current parking rates generally posted in downtown Pittsburgh reflect a significant rate increase over those rates of the summer of 1970 which appellants sought to characterize as profit-maximized.[9] It would appear, then, that the demand for parking spaces which appellants thought in 1970 would decline in the face of a price increase, thus resulting in a decrease of gross receipts, in fact now supports the increased rates of 1973. Whether or not gross receipts have fallen I, of course, do not know; I suggest that the increased prices have now been in effect long enough for appellants to have determined whether their operations are losing business or benefitting because of them. And finally, there is the fact that there exists at this time no source of supply which could satisfy any portion of the demand now satisfied by appellants' garages and lots. This brings me to the position of the Pittsburgh Parking Authority.

---

[8] I would consider the experience of Meyers Bros. as only of marginal relevance to the situation in the City at large. The Chatham Center Garage rates both in 1970 and in 1973 have been less than those in comparable downtown garages, which no doubt indicates a less strategic competitive position.

[9] See the Appendix to this opinion.

## III.

Whether or not appellants possess the market power to shift the incidence of this tax depends to a large degree on the presence of competitors, i.e., other sources of supply capable of satisfying demand formerly satisfied by appellants. Were it the case that the Parking Authority and appellants were *individually* capable of satisfying *all* demand in the market, *any* price differential between the rates of the Authority and those of appellants would logically cause all demand to seek the source of cheapest supply. Under such a market condition, appellants would necessarily charge rates the same as or lower than those of the Parking Authority and would be unable to pass a parking tax on to the consumer if doing so caused them to charge rates above those of the Authority. If the tax thus imposed also removed all profitability from the private business of commercial parking, then I think the evidentiary requirements of *Philadelphia v. Samuels*, supra, would be met.

It is clear, however, that such is not the situation here. The record shows that there are some 24,000 parking spaces in downtown Pittsburgh; of these, 17,470 are controlled by appellants here and 6,530 are controlled by the Pittsburgh Parking Authority; there exists also a demand, as yet unsatisfied, for approximately 4,000 additional spaces, a demand which is projected to increase by 1979 to 10,500 spaces. The price differential between the lower rates of the Parking Authority and the higher rates of appellants which so concerns the majority is proof positive, so it seems to me, that appellants supply a demand that cannot be satisfied by the Authority. This is to say, an entrepreneur (the appellants) who controls 71% of the supply in a market of unsatisfied demand need not concern himself with a low-cost competitor (the Parking Authority) who con-

trols 29% of the supply, has no excess capacity, and cannot service demand which the 71% competitor might drive away through price increases. The competitors with which appellants must concern themselves are the *alternatives to driving* (i.e., public transportation, car pools, etc.). But there is much public debate today whether the American driver can be forced out of his privately-owned and privately-driven automobile, whatever the cost of operation may be.

The presence of the Parking Authority in this picture, and its preferred status in terms of property taxes, is therefore in my view an irrelevant factor.

For the reasons given, I would remand for further proceedings to determine appellants' *actual* experience under the 20% gross receipts ordinance and would reserve judgment meanwhile on the question of whether an unconstitutional taking by excessive, confiscatory taxation has occurred.[10] I therefore dissent.

---

[10] I would consider it unfortunate if today's opinion might be thought to have restrictive implications for the future discouragement by a metropolitan government of the operation of private vehicles in the congested, downtown areas. Governmental activity in the field of environmental and motor vehicle control is increasing apace. This trend may ultimately remove the profitability from some commercial activities, such as providing parking space, which today depend on the automobile. I should hope that government is not constitutionally obligated to purchase those activities. Under current Fifth Amendment law, I am satisfied that is not the case. *Goldblatt v. Hempstead*, 369 U.S. 590, 8 L. Ed. 2d 130 (1962).