Southeastern Pennsylvania Transportation Authority, Appellant, *v.* Yellow Limousine Service, Inc., Appellee.

573

Argued September 5, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Lewis H. Van Dusen, Jr.,* Chief Counsel, with him *J. Freedley Hunsicker, Jr.,* and *Drinker, Biddle & Reath,* for appellant.

*Irving R. Segal,* with him *William M. Barnes, Ralph S. Snyder* and *Schnader, Harrison, Segal & Lewis,* for appellee.

OPINION BY JUDGE ROGERS, November 20, 1973:

The Southeastern Pennsylvania Transportation Authority (SEPTA) here appeals from an order of the Court of Common Pleas of Philadelphia County restraining it from instituting direct bus service from Philadelphia International Airport to center city Philadelphia.

SEPTA is an authority formed pursuant to the Metropolitan Transportation Authorities Act of 1963, Act of August 14, 1963, P. L. 984, 66 P.S. §2001 et seq.

Its constituent members are the City of Philadelphia and the Counties of Bucks, Chester, Delaware and Montgomery. It is charged by the Legislature with the duty of combining, improving, extending and supplementing public transportation systems in the Philadelphia metropolitan area, which systems the Legislature found to be so underdeveloped and obsolete as to have harmed the economic and social health of the area, depreciated property values, reduced tax revenues and generally made the area a less desirable place to live and work. Metropolitan Transportation Authorities Act of 1963, *supra,* §2, 66 P.S. §2002. SEPTA's mission, as specifically provided by the Act, is that of planning, acquiring, holding, constructing, improving, maintaining, operating, and otherwise functioning with respect to a *transportation system* in the metropolitan area. Metropolitan Transportation Act of 1963, *supra,* Section 4, 66 P.S. §2004(a). SEPTA has broad and inclusive powers to do all that is necessary for the accomplishment of its mission.

Philadelphia International Airport, located at the southerly extremity of the City of Philadelphia and extending into portions of Delaware County, is the principal air terminal of the Philadelphia metropolitan area. The Philadelphia metropolitan area was in 1969 and still is the fourth most populous metropolitan area in the United States.[1] The Philadelphia International Airport is the only airport of the ten most populated metropolitan areas in the United States which does not have a direct mass transportation facility between its principal airport and city center. The *only* means of direct transportation between the Philadelphia International Airport and center city are by private automobile, by taxicab, and by limousine service provided by Yellow

---

[1] World Almanac 1969, Newspaper Enterprise Association, Inc., publisher.

Limousine Service, Inc. (Yellow Limousine), SEPTA's adversary in this lawsuit.[2]

In July 1969, SEPTA, believing that transportation in the metropolitan area would be improved by providing direct bus service between the airport and center city, published a tariff under which it proposed to provide a scheduled bus service between the airport and downtown transit centers, seven days a week between the hours of 7:00 in the morning and 9:30 in the evening for a charge of $1.00 one way, with five cents additional to transfer to any intersecting SEPTA route, and less 30 cents for passengers presenting a valid transfer from an intersecting SEPTA route. The buses would run at 30 minute intervals during hours of peak travel and at 45 minute intervals at other times. Each bus would accommodate 49 passengers and their luggage.

Yellow Limousine is a public utility certificated, *inter alia*, to render an airport transfer service throughout the City of Philadelphia and in certain areas of Montgomery and Delaware Counties. Its use of its certificate in the airport transit service consists of the operation of 27 eleven passenger limousines between the airport and several large hotels and motor inns in center city and one large hotel and apartment complex near the intersection of City Line Avenue and the Schuylkill Expressway, some miles from downtown. Its limousines operate from the airport 24 hours a day, seven days a week, but from the downtown hotels to the airport only between the hours of 6:00 A.M. to 11:00 P.M., also seven days a week. From the center city hotels to the airport the limousines run on a 30 minute

---

[2] SEPTA has three bus routes which have stops at the airport. Two of these terminate at a subway station about 2 and 5/8's miles from center city and the third terminates in West Philadelphia, about 45 blocks from center city.

schedule; from the airport to center city they are on an irregular schedule, departing when filled, but not less frequently than every 15 minutes. On the trips from the airport to center city the limousines will deviate to accommodate persons desiring to go places other than the designated hotels. The cost of the trip is $1.75. The limousines were described by a representative of Yellow Limousine in these proceedings as "11 passenger airport transport cars, which some people call stretch-outs. What they really are are passenger automobiles which are sent to a firm in the midwest which breaks them apart and puts in two extra seats and two extra doors, and they are known as stretch-outs or 11 passenger limousines."

Pursuant to Section 4(d)(9) of the Metropolitan Transportation Authorities Act of 1963, *supra*, 66 P.S. §2004(d)(9), a hearing on SEPTA's proposed tariff was conducted by an examiner and later by the SEPTA board. Yellow Limousine appeared in opposition. The examiner recommended the implementation of the tariff and SEPTA's board passed resolutions adopting its examiner's recommendation. As provided by Section 4(d) (9), Yellow Limousine appealed the board's action to the Court of Common Pleas of Philadelphia County which, as previously noted, restrained SEPTA from instituting the proposed service.

SEPTA is empowered to use "any public road, street, way, highway, bridge or tunnel for the operation of a transportation system within the metropolitan area." Metropolitan Transportation Authorities Act of 1963, *supra*, §4(d)(20), 66 P.S. §2004(d)(20).

Section 9 of the Act,[3] however, provides: "The authority shall not have the right to use any street or public way presently occupied by a public utility engaged in local passenger transportation, for a compet-

---

[3] 66 P.S. §2009.

ing purpose, without the agreement of such public utility." The order below was founded on Section 9. The court defined the phrase "for a competing purpose" as any "comparable service which serves to diminish the revenue-producing ability of the utility" and concluded by a comparison of the facts concerning SEPTA's proposed service and Yellow Limousine's existing service, that the two were comparable. We believe that the lower court erred.

As we have earlier noted, SEPTA is empowered to operate only a transportation system, defined in the Act as: ". . . all property, real and personal, useful for the transportation of passengers for hire, including but not limited to power plants, substations, terminals, garages, bridges, tunnels, subways, elevated lines, monorails, railroad motive power, trains, railroad passenger cars, and equipment, belt conveyors, inclines, car barns, street cars, buses, rails, lines, poles, wires, stations, off-street parking facilities, rights-of-way, as well as the franchises, rights and licenses therefor, including rights to provide group and party services: Provided, That such term shall not include taxicabs." Metropolitan Transportation Authorities Act of 1963, *supra,* §3(a)(8), 66 P.S. §2003(a)(8). The transportation of passengers by automobile is not included within that definition and taxicabs are specifically excluded. Since SEPTA may not, therefore, transport passengers by automobile, it follows that the Legislature could not have intended by Section 9 to protect utilities engaged in that activity. Section 9 does protect from SEPTA competition those public utilities which require protection, that is, those engaged in the activity SEPTA is authorized to follow, the operation of a transportation system. These included, of course, PTC and the Philadelphia Suburban Transportation Company, both of which were acquired by purchase. Since Yellow Limousine operates limousines, or as its representative de-

scribed them, "passenger automobiles with two extra seats and two extra doors," it does not occupy the city streets with a transportation system. The absurdity of a contrary conclusion is that it would allow Yellow Limousine and its affiliate, Yellow Cab Service, Inc., both of which have authority to operate throughout the city and the latter of which does so operate, successfully to protest an extension of SEPTA's bus, elevated or subway lines anywhere in the city.

Assuming, however, that Section 9 was intended to protect the appellee's operation of a limousine service, it is only applicable if SEPTA's purpose is to compete. The primary, and we believe usual, meaning of the word compete is "to seek or strive for something for which others are also contending." *Webster's Third New International Dictionary*, 1966. The lower court employed the secondary meaning of the adjectival form, "competing," as something which is comparable; and concluded that since the two services had some similar characteristics, SEPTA's proposal fell within the interdiction of Section 9. Of course, any transportation service from the airport to center city which SEPTA may provide, including the suggested and much desired high-speed train line, would be comparable to Yellow Limousine's activities in that it would provide passenger transportation between the same general locations. We believe that Section 9 was not intended to prohibit SEPTA activities similar to existing services in that broad sense, but only such as are designed and meant to take an existing utilities' patrons. The SEPTA proposal is clearly directed to persons who presently use its buses or private automobiles to reach the airport, not Yellow Limousine's hotel clientele. In any case, to compete with Yellow Limousine would require on SEPTA's part the provision of equipment and services much more like Yellow's hotel-door-to-airport, 11 passenger limousine ride for $1.75, than the proposed $1.00,

49 passenger bus trip from railway stations, bus terminals and street corners in center city.

Finally, the lower court labored under several misapprehensions of fact which may have influenced its conclusions, the most serious of which was that Yellow Limousine's vehicles were capable of carrying 20 passengers, an unlikely number to be transported in a vehicle smaller than a bus.

Order reversed.

---

DISSENTING OPINION BY JUDGE KRAMER:

I respectfully dissent. In yet another case, this Court is confronted with issues brought about by the heavy hand of an awesomely powerful governmental body seeking to utilize its specifically delineated legislative power to improve its proprietary-governmental business through competitive services, while enjoying tax and other operating advantages to the detriment of its private industry competitor, in what I believe is an unconstitutional manner. From a purely philosophical-political point of view, we have witnessed in cases before this Court a seemingly never-ending extension of governmental proprietary interests through expansion of the theories evolving from the concept of the police powers, resulting in a constant depletion and erosion of the private citizen's constitutional rights.

This writer must confess that to any person who has experienced the incongruous situation of having flown across the State in much less time than it takes the airport limousine service to get from the airport to Center City, Philadelphia, and for those of us who have waited in inclement weather for the arrival of airport transportation, and thereafter to be jammed like sardines into an unclean and uncomfortable vehicle, there is a temptation from the practical side of things to conclude that additional service, any kind of service, may be needed or desirable; but personal emotional feelings

cannot be permitted to control the outcome of any lawsuit.

As this writer pointed out in *City of Philadelphia v. SEPTA*, 1 Pa. Commonwealth Ct. 101, 271 A. 2d 504 (1970), SEPTA, as an authority, is a separate body corporate and politic, and although it is not entirely governmental, it is also not entirely private. It is an independent agency of the Commonwealth, rather than a creature, agent or representative of the municipality organizing it. As the lower court pointed out in this case: "The Legislature did not intend to pit this public enterprise [SEPTA] against a private enterprise in a contest for the same business trade or customers. The Authority [SEPTA] with its tax-free operation, subsidies and grants from Federal, State and Local governmental bodies is in a position to unfairly compete with private business. We must bear in mind that private enterprise, unlike the Authority [SEPTA], must depend solely upon the fare box for its revenue."

At this point, it is indeed appropriate to point out that our Supreme Court in the case of *Alco Parking Corporation v. City of Pittsburgh*, 453 Pa. 245, 307 A. 2d 851 (1973), has taken a giant step in recognizing the current problem of governmental agencies competing with private enterprise. In that case, the municipality levied what was determined to be a confiscatory tax upon private parking operators. The Court pointed out that the municipality was competing with these private businessmen through a public parking authority, and that the combination of tax exemptions, lower interest afforded public financing and other benefits derived through the Authority approach to governmental proprietary interest, combined with the levying of a tax presented the Authority an "extraordinary competitive advantage." It stated: "This governmental enterprise competing with private industry adds not only a new and most significant dimension to the traditional con-

stitutional problem of what constitutes a taking without due process but also an impermissible one." 453 Pa. at 269, 307 A. 2d at 864. It went further in stating: "This is admittedly a case of first impression in this Commonwealth. Traditionally governmental activities held to be unconstitutional takings of property without due process of law are restricted, for example, to the realm of zoning and eminent domain. However, no reason has been suggested why unconstitutional takings must necessarily be restricted only to this segment of the law. Indeed, this Court has held that 'a "taking" is not limited to an actual physical possession or seizure of the property; if the *effect* of the zoning law or regulation is to deprive a property owner of the lawful use of his property it amounts to a "taking," for which he must be justly compensated:' Cleaver v. Board of Adjustment, 414 Pa. 367, 372, 200 A. 2d 408, 412 (1964) and cases cited therein.

"Moreover, in determining what is a taking this Court may not allow form to prevail over substance. As the Supreme Court noted. 'The substance and not the shadow determines the validity of the exercise of the power.' Stewart Dry Goods Co. v. Lewis, supra, 294 U.S. at 555, 55 S. Ct. at 527." (Emphasis in original). 453 Pa. at 269, 307 A. 2d at 864. In *Alco, supra,* Justice ROBERTS quotes in a footnote from *Hasegawa v. Maui Pineapple Co.,* 52 Haw. 327, 475 P. 2d 679 (1970), wherein the Supreme Court of Hawaii stated: " ' In this case money, instead of realty, is being taken for a public use. However, we see no difference between the taking of money to pay public employees and the taking of realty to house government institutions. *In both instances, the State is seeking to enhance the economic value of a government enterprise at the direct expense of a particular individual or group. This is precisely the kind of government "taking" which requires just compensation.'* Id. at 334, 475

P. 2d at 684 (footnote omitted) (emphasis added)." 453 Pa. at 268, 307 A. 2d at 864, n. 14.

This writer suggests that the reasoning and holding of *Alco* applies with equal force to this case.

On the merits, the court below was absolutely correct, from this writer's point of view, in holding that SEPTA was precluded from initiating the proposed airport express bus service under the provisions of Section 9 of the Metropolitan Transportation Authorities Act of 1963 (MTA), Act of August 14, 1963, P. L. 984, 66 P.S. §2009, which states: "The authority shall not have the right to use any street or public way presently occupied by a public utility engaged in local passenger transportation, for a competing purpose, without the agreement of such public utility." After a very careful reading of the record in this case, I can come to no other conclusion but that the proposed SEPTA service will be in direct competition with the Yellow Limousine Service, a public utility. SEPTA would have us twist the descriptions of the vehicles used by Yellow Limousine so that they could be designated "taxicabs," thereby coming within the expressed exemption of Section 3(8) of MTA, 66 P.S. §2003(8). Only the delusions of an ardent advocate could twist the record in this case to such an extent that airport "limousines" are "taxicabs." The mere fact that the Pennsylvania Public Utility Commission (PUC) distinguishes between limousine service and taxicab service, as is evidenced by the distinction in the certificates issued to the Yellow Limousine Service Company and the Yellow Taxicab Company, should be sufficient to draw a legal distinction.

The majority would have us believe that because Yellow Limousine charges $1.75, as compared with the proposed $1.00 charge of SEPTA, that SEPTA will service a different kind of customer and therefore, there is no competition. My reading of the record discloses

584

that the main witness (Berdan) for SEPTA stated twice in the record that the service will be competitive. The record also clearly shows that if SEPTA's proposed service is put into effect, the Yellow Limousine service will be drastically affected.

The Legislature clearly set forth in MTA that if SEPTA desires to compete with any transportation public utility, it must either obtain that utility's agreement, or proceed to attempt condemnation. Therefore, with regard to the question of statutory authority in SEPTA to inaugurate the service proposed, I would affirm the court below.

In addition thereto, however, the court below held that SEPTA had proven a "need" for this service. My review of the record leads me to believe that the court below erred in this regard. There is not one word of testimony by any witness showing that the service of Yellow Limousine is inadequate. I believe that the lower court has misinterpreted the word "need" as found in the statute. Section 4(d)(28) of MTA, 66 P.S. §2004(d)(28) permits SEPTA to extend service "into areas which have sufficient need for them to economically or strategically justify such extension." This must be read in conjunction with Section 9, mentioned above.

The only showing of need which SEPTA made in this case was its *belief* that it was economically feasible for it to enter into this new venture. That SEPTA requested only that this airport bus service be offered on an "experimental" basis is proof of this fact. In other words, if the proposed operation is not economically feasible, only then would SEPTA say there is not a need.

I suggest that this approach to the word "need" is improper. The need is the public need, not the need of SEPTA. While I recognize that the economic feasibility to SEPTA has some bearing on whether SEPTA

should extend its service, economic feasibility should not necessarily control the determination of "need." If further proof of SEPTA's stilted position were required, I should point out that whereas Yellow Limousine has for many years offered services seven days a week, 24 hours a day with regular scheduled routes between 6:00 A.M. and 11:00 P.M., SEPTA proposes on an "experimental" basis to offer service only from 7:00 A.M. through 9:30 P.M. This assumes that Yellow Limousine would be willing to offer service between 9:30 P.M. and 7:30 A.M., when the record indicates that almost all of such profitable airport service is rendered between the hours SEPTA has chosen to take for itself.

SEPTA also alludes to a two-month labor dispute between Yellow Cab and Yellow Limousine and their drivers' union which they set forth as a basis for a showing of need. This labor dispute may be the reason that SEPTA proposed this new airport service at this time, but the labor dispute should not be used as the basis for the showing of need. SEPTA's drivers also may some day be on strike, and it is not hard to imagine the argument which SEPTA would raise if some citizen, or some transportation company, attempted to use that proposition in order to take over some portion of SEPTA's transportation system. In summary, my review of the record permits me to conclude that SEPTA never showed a need for the service it proposed.

SEPTA also makes much over its argument that there can be no competition without a "common class of customers." SEPTA argues that it will be the poorer, or more economy-minded, airline passengers who will utilize SEPTA's service, whereas the wealthier class of customers will continue to use Yellow Limousine. This is a makeshift argument for the record also discloses that it is the economy-minded airline passenger who takes the limousine service rather than the more

expensive taxicab. There is absolutely nothing in this record upon which SEPTA can base this assertion except the self-serving declarations of its own witnesses. It should be noted first that in the recommendations of the Hearing Examiner, SEPTA's fare structure was subject to complete change following studies made during the "experimental period." At this point in time, no one knows whether or not SEPTA will be able to offer this service at less than what Yellow Limousine charges. Next, I believe I can take judicial notice of the fact that it is more expensive to travel across this Commonwealth by plane than by train or bus. It seems reasonable to conclude that anyone who can pay the additional money to travel by plane can afford to take the limousine.

The public would be the big loser under the SEPTA plan. It seems reasonable to assume that many of the people utilizing the airport are traveling to Philadelphia. Many of them will be housed in hotels or motels in Philadelphia. The record indicates that under the SEPTA plan, its buses would not stop in front of hotels or motels, and therefore, the traveling public could be forced to carry its bags as far as two blocks.

The City of Philadelphia filed a brief in this case as *amicus curiae* in support of SEPTA's position. Once again from a practical standpoint, the City's brief is persuasive. It speaks of the air pollution problem caused by so many private automobiles being driven to the airport, and argues on evidence, dehors the record, of the bad financial condition of Yellow Limousine and its inability to keep pace with the increase in air passenger statistics. Under the law, as I view it, the City has an avenue open to it if it desires to prove its assertions in a proper legal fashion. It may file a complaint with the PUC. The fact that it has not filed such a complaint seems to support an argument contrary to the City's position, i.e., that the City must be

satisfied with the airport limousine service it now has. Furthermore, according to the City's brief, it controls the airport facilities. Accepting this assertion as true, cannot the City control the use of private automobiles transporting people to its airport through control of its parking lots? If the City's airport parking charges for automobiles were in excess of the Yellow Limousine charge, would not the City to some extent limit the use of private automobiles? As a user of Philadelphia's airport, it is the observation of this writer that the City has aided and abetted in the creation of the problem about which it now complains for the private automobile parking lots at Philadelphia Airport have been expanded to mammoth proportions in recent years.

By filing this dissent, I do not mean to imply that SEPTA could not improve the existing service. The record indicates that SEPTA has for many years operated three bus routes to points near the airport, i.e., routes U, M and 37. Clearly, it could have more buses per day, or larger or more comfortable or more desirable buses, along these routes. What I am saying, however, is that Section 9 of MTA, 66 P.S. §2009, is a legislative declaration that without the agreement of the duly certified PUC common carrier affected, SEPTA may not inaugurate and develop a new service in direct competition with said carrier. To draw the distinction between SEPTA's buses, taxicabs, limousines and automobiles is to stretch the elasticity of interpreting legislative intent to the breaking point, whereafter the theory cannot be held together. To imply that SEPTA's proposed airport bus service will not compete with Yellow Limousine follows the action of the proverbial ostrich. If Yellow Limousine's service is not adequate (which is certainly not proven in the record of this case), the City and SEPTA have an adequate remedy at law before the PUC.

During the 12-month period ending June 30, 1969, Yellow Limousine transported 368,952 passengers between the airport and Center City, Philadelphia. This service was provided through 27 limousines, known as "stretch outs" or "Airport mini-buses," and utilized the services of 44 full-time employes with a payroll of $408,303.00 in 1968. There is not one word in this record that Yellow Limousine has not fulfilled the public's need. Yellow Limousine is a duly certificated PUC public utility carrier specifically licensed to carry out the service proposed by SEPTA.

If Yellow Limousine is put out of business, which is a very practical consideration in this case, it seems to me that the transportation system in Eastern Pennsylvania will be directly affected. It is because of these considerations that the Legislature intended SEPTA to be precluded from competing with PUC certificated public utility carriers. Certainly the Department of Transportation and the PUC have jurisdictional interests which surpass and take precedence over the desires of SEPTA's Board to enter into a new transportation venture (if economically feasible) in competition with another carrier licensed by the State.

Finally, the whole point of this dissent is that if SEPTA is permitted to institute this "experimental" airport bus service, and this new service will work to the detriment of Yellow Limousine as a competitor (which the record fully supports), then it not only violates Section 9 of the MTA, but in addition constitutes a taking of Yellow Limousine's property without compensation which, from this writer's point of view, will be a blatant violation of both the State and Federal Constitutions. I would affirm the Order of the court below, and if necessary, I would also reverse the lower court on its finding that SEPTA had proven a need for the additional service.